UNITED STATES of America, for the Use and Benefit of R. W. FINE, et al., Plaintiffs,

v.

TRAVELERS INDEMNITY COMPANY, a corporation, Defendant, and fourteen other cases.

Nos. 1852, 1877, 1889, 1896–1898, 1900, 1901, 1912, 1917, 1937, 1945, 1947, 1954, 1964.

United States District Court
W. D. Missouri, S. D.

March 7, 1963.

---

No. 1852:

White & White, Rolla, Mo., and Neale, Newman, Bradshaw, Freeman & Neale, Springfield, Mo., for plaintiff.

Francis L. Kenney, Jr., St. Louis, Mo., and Farrington & Curtis, Springfield, Mo., for defendants.

No. 1853:

White & White, Rolla, and Neale, Newman, Bradshaw, Freeman & Neale, Springfield, Mo., for plaintiff.

Rafter & Biersmith, Kansas City, Mo., for defendant.

No. 1877:

Cohn & Lentz, Waynesville, Mo., for plaintiffs.

Kenney & Flint, St. Louis, Mo., and Farrington & Curtis, Springfield, Mo., for defendants.

No. 1889:

Miller, Fairman, Sanford, Carr & Lowther, Springfield, Mo., for plaintiffs.

Rafter & Biersmith, Kansas City, Mo., for defendants.

No. 1896:

Green, Hennings, Henry, Evans & Arnold, St. Louis, Mo., and Miller, Fairman, Sanford, Carr & Lowther, Springfield, Mo., for plaintiff.

Farrington & Curtis, Springfield, Mo., and Kenney & Flint, St. Louis, Mo., for defendants.

No. 1897:

Claude T. Wood, Richland, Mo., for plaintiff.

Owens & Purser, Austin, Tex., and Rafter & Biersmith, Kansas City, Mo., for defendants.

No. 1898:

Claude T. Wood, Richland, Mo., for plaintiff.

Owens & Purser, Austin, Tex., and Rafter & Biersmith, Kansas City, Mo., for defendants.

No. 1900:

Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., for plaintiff.

Lincoln, Haseltine, Keet, Forehand & Springer, Springfield, Mo., and Rafter & Biersmith, Kansas City, Mo., for defendants.

No. 1901:

Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., for plaintiff.

Lincoln, Haseltine, Keet, Forehand & Springer and Farrington & Curtis, Springfield, Mo., for defendants.

No. 1912:

James & Hasler, St. Louis, Mo., for plaintiff.

Lincoln, Haseltine, Forehand, Keet & Springer, Springfield, Mo., for defendants.

No. 1917:

Lashly & Neun, St. Louis, Mo., for plaintiff.

Rafter & Biersmith, Kansas City, Mo., for defendants.

No. 1937:

Cohn & Lentz, Waynesville, Mo., for plaintiffs.

Farrington & Curtis, Springfield, Mo., for defendants.

No. 1945:

Ernest A. Brooks, II, St. Louis, Mo., Lilley & Cowan, Springfield, Mo., Owens & Purser, Austin, Tex., for plaintiff.

Farrington & Curtis, Springfield, Mo., and Francis L. Kenney, Jr., St. Louis, Mo., for defendants.

No. 1947:

Kappel & Neill, St. Louis, Mo., and Cohn & Lentz, Waynesville, Mo., for plaintiffs.

Rafter & Biersmith, Kansas City, Mo., for defendants.

No. 1954:

Miller, Fairman, Sanford, Carr & Lowther, Springfield, Mo., for plaintiff.

Farrington & Curtis, Springfield, Mo., Francis L. Kenney, Jr., St. Louis, Mo., for defendants.

No. 1964:

Miller, Fairman, Sanford, Carr & Lowther, Springfield, Mo., for plaintiffs.

Rafter & Biersmith, Kansas City, Mo., for defendants

JOHN W. OLIVER, District Judge.

## MEMORANDUM AND ORDER IN RE CONSOLIDATED BRIEFS

By various orders of consolidation and by virtue of the excellent cooperation of counsel, the Court has before it consolidated briefs relating to common legal questions involved in the numerous Capehart cases pending on the docket of this Court in its Southern Division at Spring-

field.[1] This Memorandum will indicate how we will rule the questions of law discussed. After further pre-trial conference, presently scheduled at Springfield on March 14, 1963, additional orders may be made leading to the final disposition of those cases on the merits. We shall discuss the questions in the order presented by the briefs.

## I. JURISDICTION OVER THE SUBJECT MATTER

Defendants suggest that "the first, and most intriguing question, which arises under the Capehart Program concerns the fundamental issue of jurisdiction over the subject matter of suits by claimants". Defendants contend that such jurisdiction is not vested in this Court by either Section 270b of Title 40, United States Code (the Miller Act) or by Section 1352 of Title 28, United States Code.[2] Plaintiffs contend that we have jurisdiction under either or both.

It is unnecessary to determine whether or not the Miller Act might confer jurisdiction over the subject matter, because our controlling appellate court has definitely determined that such jurisdiction is vested in this Court by Section 1352 of Title 28, United States Code. Continental Casualty Co. v. United States of America for the Use and Benefit of Robertson Lumber Co., 8th Cir., 1962, 305 F.2d 794, cert. denied 371 U.S. 922, 83 S.Ct. 290, 9 L.Ed.2d 231 (hereinafter referred to as "Robertson Lumber") in footnote 4 on page 798, held that "as was recognized in Westerman [Use of Westerman, 5 Cir., 285 F.2d 98], another basis for federal jurisdiction of a suit on a Capehart bond is to be found in 28 U.S.C.A. § 1352 which provides that the State and federal courts shall have concurrent jurisdiction with respect to all actions brought on any bonds required by 'any law of the United States' ". It was further noted that "a Capehart bond is clearly a bond required by a 'law of the United States,' hence federal jurisdiction on such a bond is established without regard to any relationship between the Miller Act and the Capehart Act".

The Tenth Circuit, on this separate jurisdictional question under discussion, consistently held in United States for Use and Benefit of Miles Lumber Co. v. Harrison and Grimshaw Construction Co., 10th Cir., 1962, 305 F.2d 363, cert. denied 371 U.S. 920, 83 S.Ct. 287, 9 L.Ed.2d 229 (on the same day as in Robertson Lumber) that "we see no jurisdictional problem here as the bond was executed under a law of the United States". We have studied defendants' constitutional argument to the contrary but find it without merit.

We therefore hold that Section 1352 of Title 28, United States Code, vests this Court with jurisdiction over the subject matter of the pending cases.[3]

1. This Memorandum and Order will be filed in the cases numbered 1852, 1877, 1889, 1896, 1897, 1898, 1900, 1901, 1912, 1917, 1937, 1945, 1947, 1954 and 1964. S. S. Silberblatt, Inc., the prime contractor on one of the two Fort Leonard Wood Military Housing Projects, is named as a party defendant together with Travelers Indemnity Company in some of the cases. In others, D & L Construction Company and Associates, the prime contractor on the other Fort Leonard Wood project, is named as a party defendant, together with Continental Casualty Company. In these cases, the amount in controversy is $689,277.93, exclusive of interest, costs and attorneys' fees.

While applicable to a number of other pending cases, this Memorandum and Order will not be entered in those cases until additional questions there outstanding are determined. In this second group of cases, the amount in controversy is $127,711.38, also exclusive of interest, costs and attorneys' fees.

2. Section 1352 of Title 28, United States Code, provides:
 "The district courts shall have original jurisdiction, concurrent with State courts, of any action on a bond executed under any law of the United States."

3. Jurisdiction under Section 1352 was recently sustained by Judge Meredith of the United States District Court for the Eastern District of Missouri, in Northwest Lumber Sales, Inc. v. S. S. Silberblatt, Inc., 211 F.Supp. 749. See also and compare Judge Bartels' discus-

## II. JURISDICTION OVER THE PERSON

In several cases "D & L Construction Co. and Associates" is joined as a party defendant. It is undisputed that it is a joint venture whose members are a California corporation and two California limited partnerships composed of California residents. Defendants argue that since "neither a partnership nor a joint venture can be either sued or served as such" under Missouri law, the causes pending against that named defendant should now be dismissed and any purported service quashed.

Plaintiffs, on the other hand, while agreeing that defendants "have correctly summarized the law of the State of Missouri concerning the suability of partnerships", nevertheless contend that Rule 17(b) of the Rules of Civil Procedure contains an applicable exception to the principle that a party's capacity to sue or be sued is ordinarily to be determined by State Law.

The pertinent portion of Rule 17(b) provides that "capacity to sue or be sued shall be determined by the law of the state in which the district court is held, except (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States * * *" 2 Barron and Holtzoff, Federal Practice and Procedure, § 487 at page 50, correctly points out that the exception contained in Rule 17(b) "introduced no great change in the practice in the federal courts existing before the Rules were adopted". Judge Learned Hand, in Sperry Products v. Association of American Railroads, 2 Cir., 1942, 132 F.2d 408, pointed out that the exception in Rule 17(b) covers the same ground and, in effect, codified the rule of decision announced by the Supreme Court in

United Mine Workers v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975 (1922).

3 Moore's Federal Practice ¶17.25 at pages 1410 and 1412, states that "the 'except' clause takes care of actions where jurisdiction is based upon a federal right". The precise question concerning jurisdiction over the person of the joint venture therefore turns on whether the causes of action here involved assert "a substantive right existing under the Constitution or laws of the United States" within the meaning of the exception in Rule 17(b).

The point of beginning is a fair analysis of Robertson Lumber, supra. As a district court we are bound not only by the precise holding of that case but we feel we must also fairly, and without technical nicety, accept and apply its basic rationale to the cases now pending before us.

On the other hand, our duty in this regard must not reduce itself to a black letter acceptance of words taken out of context. We are also under a duty to examine and pass on contentions made by subsequent litigants which raise questions that may not have been examined in nor determined by Robertson Lumber.

In Robertson Lumber the sole "question for decision (was) whether the notice provisions contained in the bond in suit were valid" (l. c. 798 of 305 F.2d). Plaintiff in that case contended that "a Capehart housing contractor is entitled to all the protection of the Miller Act" and also contended that "the procedural provisions of the Miller Act * * * extend to bonds executed under the Capehart Act" (l. c. 796 of 305 F.2d).

The main thrust of defendant's argument was that the language of the 1956 Capehart Act Amendment, which provided that all Capehart contracts "shall provide for the furnishing by the contractor of a performance bond and a payment bond *with a surety or sureties*

sion in connection with an entirely different factual situation in United States v. Maryland Casualty Company, 213 F.

Supp. 800, in the United States District Court for the Eastern District of New York.

*satisfactory to the Secretary of Defense"*, must, or at least should, be construed to mean, (as the argument was later accepted by the Court) that "the Secretary of Defense or his designee has the power to prescribe the form and contents of a Capehart bond" (l. c. 796).

There can be no doubt but that the Eighth Circuit did accept that argument. On page 799 of 305 F.2d, it stated: " * * * Congress said in the Capehart Act that *the giving of a bond satisfactory to the Secretary of Defense,* or his designee, should constitute compliance with the section of the Miller Act which requires that a bond be given * * * ". The Court approvingly recognized that the form of the Capehart bonds was "worked out by the Department of Defense and the Federal Housing Administration" (l. c. 797) which, of course, assumed that the language in the 1956 Capehart Act Amendment which conferred power on the Secretary of Defense to determine whether the surety was "satisfactory" was legally sufficient to confer additional power on the Secretary of Defense to *write a form of bond* that was satisfactory to him. More specifically, the Court in Robertson Lumber held that the failure of the plaintiff to comply with the dual notice provisions written into the bond by the Secretary of Defense, even though he had complied with the notice provisions of the Miller Act, was fatal to his right of recovery. The Court carefully noted the District Court's reliance upon Lasley v. United States for the use of Westerman, 5th Cir., 1960, 285 F.2d 98, and like cases (l. c. 798 of 305 F.2d, and see Judge Davies' opinion reported in D.C., 196 F.Supp. 171).

But the Court of Appeals obviously refused to project the jurisdictional theory of Westerman and the other cases *as being applicable to the notice provisions of a Capehart bond.* On the other hand, it very carefully refrained from passing on the question of whether the basic jurisdictional theory of the Westerman line of authority was or was not sound. On page 799, the Court stated that it was not necessarily quarreling with the Westerman premise that prior to 1956 Capehart contractors were required to furnish Miller Act bonds. And at page 797 of 305 F.2d the Court definitely recognized that "Capehart housing is undoubtedly 'Government housing' ".

The Eighth Circuit, in Robertson Lumber, in quite sharp conflict with the rationale of the Tenth Circuit in United States v. Harrison and Grimshaw Construction Co., 10th Cir., 1962, 305 F.2d 363, did not hold that the Miller Act did not apply to a government military housing project contracted for under the authority of the Capehart Act. The Tenth Circuit's decision, on the other hand, rests upon the express determination that military housing constructed under such a government contract is not "a public building or public work of the United States" within the meaning of the Miller Act, (l. c. 366 of 305 F.2d). Interestingly enough, the Tenth Circuit noted exactly the same line of cases led by Westerman from the Fifth Circuit (l. c. 366 of 305 F.2d). But, not unlike Robertson Lumber, it also attempted to distinguish those cases on the theory that those cases "all involved federal court jurisdiction" and therefore were not applicable to cases only involving the validity of the dual notice requirement inserted in the bond by the Secretary of Defense. Both the Tenth and the Eighth Circuits, of course, assumed that the dual notice provision could legally be written into such a bond by the Secretary of Defense under the power conferred upon him by the 1956 Capehart Amendment to determine whether or not the surety on a government bond was satisfactory to him.

The fundamental rationale of Harrison and Grimshaw, over Judge Pickett's sharp dissent, rests upon its determination that when an action is brought on a Capehart bond, the courts "are confronted with a situation in which the project is built by a private entity with private funds at private risk"; that "the housing project was a private enterprise and not a public work"; and that under

"such circumstances the Miller Act does not apply".

Our controlling Court in Robertson Lumber sustained the validity of the dual notice provisions in a Capehart bond on an entirely different theory. Robertson Lumber, quite consistently with the dissent in Harrison and Grimshaw, started from the premise that "Capehart housing is undoubtedly 'Government housing'". It reasoned that, while the Miller Act does apply, at least in some respects, nevertheless, so far as the dual notice question was concerned, the Congress had given the Secretary of Defense power to require another notice in addition to that required by the Miller Act. Robertson Lumber was based on the further theory that the additional notice was procedural, as distinguished from jurisdictional, and, as a procedural requirement it could not be said that the additional notice was either unreasonable or oppressive.

If we were a district court sitting in the Tenth Circuit, we would be bound by the rationale of Harrison and Grimshaw. We would, in such an event, be required (in spite of our obvious disagreement with the fundamental reasoning upon which that case must be said to rest) to apply that theory to the pending cases.

But we sit in the Eighth Circuit and are therefore required to follow Robertson Lumber in regard to the dual notice question. We feel further bound to apply the rationale of that case as best we can to the other questions involved. Such an application must take into account the paramount proposition that Robertson Lumber is bottomed on the premise that government contracts are involved; that the Miller Act is generally applicable to all government contracts; that there is, however, some sort of a difference between the procedural requirements and the jurisdictional provisions of the Miller Act; and that power was in fact conferred by Congress upon the Secretary of Defense by the 1956 Capehart Act Amendment to change the procedural requirements of the Miller

Act, if such an administrative change can be judicially said to be neither unreasonable nor oppressive. Unlike Harrison and Grimshaw, Robertson Lumber can not be said to be a definitive holding that the Miller Act does not in any way apply to the contracts for the construction of military housing as authorized by the Capehart Act.

▮ The rationale of Robertson Lumber, as we understand it, requires us to hold that we are here dealing with substantive rights existing under the laws of the United States within the meaning of 17(b) (1) of the Rules of Civil Procedure. It would indeed be difficult to say in one breath that jurisdiction over the subject matter is present because these cases involve actions on bonds required by the laws of the United States within the meaning of Section 1352 of Title 28, U.S. Code, and to say in the next breath that the capacity of the parties to sue and be sued on those bonds is to be controlled by State law because no action seeking to enforce a federal substantive right is present within the meaning of Rule 17(b) (1) of the Rules of Civil Procedure. Such an effort is too difficult for us to attempt.

This does not mean, however, that we are as free to apply the rationale of the Westerman line of cases as was Judge Davies as the trial judge in Robertson Lumber (see D.C. 196 F.Supp. 171 at 172). We believe that we must, as did Robertson Lumber, treat those cases as distinguishable on the dual notice question. We must make, whether we agree or not, the same assumption made in Robertson Lumber in regard to the extent power was vested by Congress in the Secretary of Defense by its passage of the 1956 Capehart Act Amendment. In short, we must assume as settled that Congress intended that the Secretary of Defense was vested with power to require that a government contractor give "a bond satisfactory to the Secretary of Defense or his designee" (l. c. 800 of 305 F.2d). But, Robertson Lumber did not hold, nor does any application of its rationale require, that we approve all pro-

visions that the Secretary of Defense may have seen fit, in the exercise of his assumed power, to write into bonds required by law.

We think the clear intimation of Robertson Lumber is that the particular provisions that the Secretary of Defense may have elected to insert in the bonds must be examined individually and that a judicial determination must be made as to whether those provisions are in accordance with other applicable existing law; whether, if not in accordance with existing law, the existing applicable law must be read into the bonds; and whether, in any event, the provisions inserted are either unreasonable or oppressive.

We have struggled with the language of Robertson Lumber which states that "the clear import of the language used (by the Congress in the 1956 Capehart Act Amendment) was used to take Capehart bonds entirely out of the Miller Act" (l. c. 800 of 305 F.2d). We have decided that the possibility that our controlling court may have intended that those words should be taken literally is sufficiently strong that we believe our judgment should, in the final analysis, be based on our consideration of whether the provisions inserted by the Secretary of Defense were or were not unreasonable or oppressive. We recognize, of course, that those words could, as counsel argue, reasonably be said to have been inadvertently used. We think that is a matter for the Court of Appeals to clarify; not this Court.

Had we been able to convince ourselves that the questions were open for our decision, we would have held that the 1956 Capehart Act Amendment conferred no more power on the Secretary of Defense to write the terms of a government bond than did the Miller Act confer such power on a contracting officer. The Congressional language used in the 1956 Capehart Amendment was substantially similar to that used in the Miller Act which merely authorized any Contracting Officer to insist that performance and payment bonds be executed by a surety or sureties that were "satisfactory" to him. We can not see that the 1956 Capehart Act Amendment did any more than identify the Secretary of Defense as the contracting officer on military housing contracts authorized by the Capehart Act.

If we felt the questions clearly open for our decision, we would have determined that the Congress recognized in the original 1955 Capehart Act that the Miller Act would necessarily apply to the contracts for military housing construction authorized by the Capehart Act; that the real purpose of the 1956 Amendment was to remove any possible doubt about that matter; and that, in accordance with familiar law, all substantive provisions of the Miller Act and the Capehart Act would be read into all performance and payment bonds required in connection with any government housing project constructed under the Capehart Act.

Our most careful consideration of Robertson Lumber convinces us that it intended only to pass on the dual notice question; that it intended to and did postpone any definitive ruling on any question other than the dual notice question; that it sustained the dual notices because it was of the opinion that the Secretary of Defense and the FHA had been given power by the 1956 Capehart Act Amendment to insert bond notice requirements in payment and performance bonds required by law on government housing projects that were, in fact, inconsistent with the requirements of the Miller Act; and that such an inconsistent requirement must be sustained because the Court judicially determined that the inserted requirement was "neither unreasonable nor oppressive".

We are further convinced that the Eighth Circuit would not want us to blindly follow such dictum statements as: "We think the clear import of the language used was to take Capehart bonds entirely out of the Miller Act" as a blanket command for us to refuse to give a most careful consideration of the questions other than dual notice ques-

tion that are involved in the pending cases.

But, as we have stated, the deference due our Court of Appeals does not permit us to consider that those questions are clearly open. We must therefore turn to the particular provision in the bond that has been such a source of confusion to everyone connected with the construction industry and their bonding companies (to say nothing of particular federal judges who have been individually forced to handle more Capehart bond cases than the entire federal judiciary was required to handle in regard to the Miller Act over a long period of time).

The Secretary of Defense, for reasons never explained nor apparent, inserted in paragraph 4(c) of the required bond the following language:

> "4. No suit or action shall be commenced hereunder by any claimant, * * *
>
> * * * * * *
>
> "(c) Other than in a state court of competent jurisdiction in and for the county or other political subdivision of the state in which the project, or any part thereof, is situated, or in the United States District Court for the District in which the project, or any part thereof, is situated and not elsewhere".

The last clause, relating to federal court jurisdiction, was lifted in substance from Section 2(b) of the Miller Act (40 U.S.C.A. § 270b (b)). We do not have before us the question of whether a state court could legally be vested with jurisdiction over a cause of action based on a bond required by federal law by the act of the Secretary of Defense purporting to exercise the power, whatever it may be, conferred on him by the 1956 Capehart Act Amendment. We must determine whether either Congress or the Secretary of Defense (by reason of the rationale of Robertson Lumber) intended to change or alter the well established methods by which federal courts are authorized to acquire jurisdiction of the person in actions based on a government bond in an action pending in the district in which the contract was to be performed, as stated in the Miller Act, or, to use the similar language of the bond, "in which the project, or any part thereof, is situated". We do not think, and we shall so rule, that any change was intended either by the Congress or the Secretary of Defense; that substantive federal rights are being asserted against the defendants named; that their capacity to sue and to be sued is within the exception stated in Rule 17(b) (1) of the Rules of Civil Procedure; that those defendants may therefore sue or be sued in their common names; and that service had in accordance with what would have been valid service had the actions been brought on a Miller Act bond will be ruled to be valid service in these actions on bonds issued in connection with government housing projects constructed pursuant to the authority granted by the Capehart Act.

We further hold consistent with the duty imposed upon us by the rationale of Robertson Lumber, that any other construction of the provision of the bond inserted by the Secretary of Defense, written as it is in language which in effect adopts the existing applicable law, would in fact be unreasonable and oppressive.

The very factual situation presented by this case illustrates the consequences of any different construction. If the persons who allegedly supplied material and labor on the government contracts here involved attempted to sue the contractor in the State court, they would find themselves faced with the proposition, conceded by all counsel, that such an action could not be maintained because partnerships and joint ventures are not suable entities under Missouri law. The individual members of the partnership or joint venture could thus effectively defeat plaintiffs' claim by simply avoiding State service. But if plaintiffs should file an action in the fed-

eral court, their situation would not be improved unless we rule as we have indicated. Certainly we can not, under the rule of decision stated and applied in Thompson v. Terminal Shares, 8th Cir., 1939, 104 F.2d 1, 7 and 9, cert. denied 308 U.S. 559, 60 S.Ct. 100, 84 L.Ed. 470 (1939), presume that the Congress intended to overturn long established concepts of jurisdiction and service without a more explicit statement than that contained in the 1956 Amendment to the Capehart Act.

The motions to quash and to dismiss in regard to particular individual defendants will be ruled in each case in accordance with the principles stated in this Section II of our Memorandum and Order.

### III. THE CONTRACTUAL OBLIGATION OF THE BOND

What we shall say in Section V of this Memorandum and Order will cover sufficiently the somewhat abstract discussion of unquestioned general legal principles contained in the respective Sections III of the parties' briefs with one exception.

■ That exception relates to defendants' contention that "if the bonds under these contracts (referring to "two separate contracts * * * in the D & L Project" and to "six contracts * * in the Silberblatt Project") mean what they say, then each bond is limited to that part of the project contracted for in a Housing Contract and a lease". Defendants further argue that the practical effect of such a legal conclusion is to require a particular plaintiff to plead and prove that his particular "materials and labor went into the portion of the project covered by a specified bond".

Plaintiffs, on the other hand, argue that there were only two "Capehart Projects at Ft. Leonard Wood; one was

let to Silberblatt * * *; the other was let to D & L * * *", and that while, in fact, eight separate bonds were written, nevertheless, "there was only one contract" involved so far as each bonding company is involved. Plaintiffs therefore argue that "it is enough that the supplier show that he furnished materials or labor reasonably incident and necessary to the prosecution of the work provided for in the one housing contract to which the particular prime builder was a party". Plaintiffs insist that "a careful consideration of the requirements of the Capehart Act results in the conclusion that there was, in legal effect, only one bond in each instance; that is, there is only *one* Continental bond and only *one* Travelers bond". Plaintiffs, anticipating that the determination of this question has a necessary impact upon the quantum of proof that will be required of them, inquire "how, for example, can any material supplier who shipped unidentifiable goods to Silberblatt or to his subcontractors determine, at this late date, whether those goods went into one FHA area or whether into another?"[4]

Plaintiffs rely upon State ex rel. Owen v. Howerton, Springfield Ct. of App., Mo., 1933, 56 S.W.2d 152. That case is neither applicable nor persuasive. We can not understand how, "in legal effect", there is only *"one* bond" involved so far as each bonding company is concerned. Plaintiffs' questions erroneously assume that proof can be made that labor and material were "furnished * * in the prosecution of the work provided in the contract" without proof that it was either directly or indirectly, actually used on the job. We recognize, of course, as did Mr. Justice Brandeis in Brogan v. National Surety Co., 246 U.S. 257, 261, 38 S.Ct. 250, 251, 62 L.Ed. 703 (1918) that the Supreme Court "has repeatedly refused to limit the application of the act to labor and materials *directly* incorporated into the public work".[5] But the

---

4. Even more practically, plaintiffs further ask: "And, what good purpose is served by such proof? To state it bluntly, in either situation the money comes out of the same pocket".

5. We shall explain in Section V of the Memorandum and Order why we believe such Miller Act cases as Brogan must be considered as persuasive.

application of such a principle does not eliminate the necessity for proof that the labor and materials were, in fact, at least indirectly incorporated into the project. That case points out that "[t]he bare fact that the supplies were furnished to the contractor and consumed by workmen in its employ would have been immaterial". And more important, the "decisive" fact that must be established was whether, under "the special circumstances * * * the supplies * * furnished * * * were necessary to and wholly consumed in the prosecution of the work provided for in the contract and bond".

We shall apply the principles above stated to the factual situation in each particular case as those facts are developed.

## IV. CONDITIONS PRECEDENT: NOTICE REQUIREMENTS

██ Robertson Lumber, of course, definitely determines, so far as this Court is concerned, that the bond requirement established by the Secretary of Defense of "dual notice as a condition precedent to action on a Capehart bond * * * is neither unreasonable nor oppressive", and that the requirement is therefore valid and controlling. There undoubtedly are open questions of fact as to what notices were given in a particular case; whether the notices were adequate in form and substance; and whether the notices were in fact received.

██ To aid the parties in their preparation for further pre-trial and, if necessary, for actual trial, we add that we shall rule, in accordance with the rationale of Fleisher Engineering v. United States, 311 U.S. 15, 19, 61 S.Ct. 81, 83, 85 L.Ed. 12 (1940), that the purpose of the notice provision in the bond and the manner in which that notice may have been served did not "make the described method mandatory so as to deny right of suit when the required written notice within the specified time had actually been given and received".

In other words, if proof of actual service and actual receipt of an adequate notice is established, the question of whether registered mail was or was not used will be considered as immaterial.

## V. EXTENT OF BOND LIABILITY

Defendants contend that each of the eight bonds here involved "is, in its substantive provisions, an ordinary payment bond similar to those in use in any other private construction project". Defendants further argue that we are here concerned with actions "on private bonds"; that "these bonds were never intended, should not be construed, to cover the majority of the items for which claims have here been made"; that "a reasonable limit must be put to the liability of the surety"; and, on the basis of various State court decisions, argue generally that "the items protected are those which are actually incorporated into the building, those which visibly and identifiably contribute to the value of the improvement"; that "recovery for repair of equipment is * * * beyond the coverage of these claims"; that all claims for rental are not covered; and that reasonable value rather than actual value is the measure of recovery.

Plaintiffs, on the other hand, focus our attention on the obvious fact that the form of the Capehart bond established by the Secretary of Defense closely follows and incorporates much of the language of the Miller Act. Plaintiffs argue that we should therefore look to the decisions that have construed the Miller Act language which now appears in the bonds required by the Secretary of Defense on Capehart projects in order to understand what those bonds actually mean; that, in the language of plaintiffs' argument, "the district courts must look to the interpretation that has been placed upon the substantive provisions of the Miller Act to determine the extent of the defendants' liability under Capehart bonds".

Other than suggesting that acceptance of their argument would be more in ac-

cord with an assumed Congressional intent that Capehart bonds would receive uniform national interpretation rather than being subject to peculiarities of the laws of the various States, plaintiffs do not spell out any particular reasons in support of their legal conclusions. We believe, however, that in spite of the somewhat sparse Congressional history, there are a number of quite valid reasons that convincingly support the main thrust of plaintiffs' argument.

We do not mean to intimate that we reject plaintiffs' suggestion that had Congress thought about it, it probably would have concluded that a surety company should be liable to the same extent in Missouri as it would be in any other State. The absence of any expressed Congressional intent on that and on other scores, of course, puts the basic question involved in that difficult area described by Gray in his lectures on the "Nature and Sources of the Law" (Section 370 p. 165) where judges must determine not "what the legislature did mean on a point which was present to its mind, but to guess what it would have intended on a point not present to its mind, if the point had been present". Cf. Cardozo, "The Nature of the Judicial Process" (pp. 14–18). We cannot think that Congress would have intended that 50 different constructions be given the same language in exactly the same bond on exactly the same sort of military construction projects.

Other courts have noticed the obvious fact that language contained in the required Capehart bond was borrowed from the Miller Act. Judge Watkins, in his Ft. George G. Meade cases, United States to the Use of Acme Furnace Fitting Co. v. Ft. George G. Meade Defense Housing Corp., D.C., 186 F.Supp. 639, for example, stated that "[t]his regular government bond form * * * in the statement of its conditions, significantly, sets forth in substance the provisions of the Miller Act enacted for the protection of suppliers of labor and materials on public works." (l. c. 648 of 186 F.Supp.)

And more important for parties litigating in the Eighth Circuit, Robertson Lumber held that "we think that Congress intended that Capehart suppliers should have substantive bond protection essentially similar to that afforded Miller Act suppliers".

Judge Pickett, in his dissent in Harrison and Grimshaw, accurately described how the Capehart Act actually works. He noted that by the acceptance of a bit of formalism, the Congress adopted a practical plan that would "permit the United States to acquire housing for members of its armed services on the installment plan" (l. c. 369 of 305 F.2d). Judge Pickett correctly stated that "the (Capehart) Act contemplates that the United States will be a party to any contract for the construction of housing pursuant to its provisions"; that "[t]he houses are to be built on land owned by the United States"; and that "title to the houses passes to the United States as they are completed" (l. c. 369 of 305 F.2d). Judge Pickett concluded that "Stripped of its formalism, the arrangement is simply one whereby the United States is able to finance the construction of housing projects through loans obtained by its prime contractor, which the United States is obligated to repay" (l. c. 369 of 305 F.2d).

While the specific legislative history of the 1956 Amendment to the Capehart Act is quite scanty, the legislative history of the general federal housing program of which the amendment was but an exceedingly small part is as voluminous as it is instructive. Title VIII was added to the National Housing Act by Public Law 211 in 1949 (See 1949 U.S. Code Cong.Serv., p. 582). House Report No. 854 relating to that legislation (1949 U.S.Code Cong.Serv., p. 1757) declared that "[t]he purpose of the bill is to encourage private enterprise to construct rental housing to serve the needs of personnel at military installations, primarily through (1) the provision of a special form of mortgage insurance designed to meet the particular problems involved, (2) the leasing of sites by the

Military Establishment free from the right of revocation, and (3) the provision of utility services by the Military Establishment on a long term basis". That report on the legislation that became popularly known as the Wherry Act, hoped for "the achievement of lower rentals for the personnel of the establishment" (1949 U.S.Cong.Serv., p. 1758) and to afford encouragement "that private builders be encouraged to construct as much of this housing as possible" (1949 U.S.Cong.Serv., p. 1760). A great deal of construction was commenced and completed under the Wherry Act, with results that later, as will be noted, had the attention of the Congress.

Conference Report No. 1622 on the Housing Amendments of 1955 (1955 U.S. Code Cong.Serv., pp. 2902, 2931) states that the amendments to the housing laws passed in 1955 were designed to "bring the Wherry Act up to date, and make it a fully workable vehicle for obtaining privately built, privately financed, and privately owned housing in many areas where housing for the military may be needed." [6]

But when the Housing Act of 1956 was passed, including as it did the single sentence amendment to Section 1594 of Title 42, U.S.Code, which made reference to payment and performance bonds, (see Public Law 1020, 1956 U.S.Code Cong. and Adm. News, p. 1291, at page 1314, including footnote 77), the Congress expressed a distinctly different view of Wherry Act housing. House Report No. 2363 relating to the Housing Act of 1956 (1956 U.S.Code Cong. and Adm. News, p. 4509 at 4550 and 4551) stated that the intended "purpose of the original title VIII program (Wherry housing) was to assist in relieving the acute shortage and urgent need for family housing which existed at or in areas adjacent to military installations * * *." The report explained, however, that "[u]nfortunately, * * * many Wherry units do not really solve the military's need. They generally are not up to the standards of public quarters built with appropriated funds. In many cases their rentals are too high to attract military personnel on a voluntary basis. The latter drawback will be aggravated further by the recent Supreme Court decision ruling that Wherry projects are subject to local taxes".[7]

As as have noted, under the Housing Amendments of 1955, the United States was merely authorized to acquire the Wherry Act housing. Provision, however, was made in the Housing Act of 1956 making mandatory the acquisition by the United States of all the projects built under the Wherry Act. The 1956 legislation clearly expressed the new and radically different Congressional policy that all military housing should be owned and operated by the United States. "Your

6. That report on the page cited also stated that under the Wherry Act "some 88,000 units for military personnel have been or are in the process of being built by private enterprise with private funds" and that "it does not seem desirable to abandon this useful act; rather, it seems preferable to try to make it as workable as possible and use it wherever it can do the job". Significantly, however, another provision in the Housing Amendments of 1955 included "a provision which would permit the military to purchase any Wherry Act project * * * or to acquire the property by condemnation in case reasonable efforts to negotiate a purchase are unsuccessful" (1955 U.S. Code Cong. and Adm.News, p. 2932).

7. The reference was to Offutt Housing Co. v. Sarpy County, 351 U.S. 253, 76

S.Ct. 814, 100 L.Ed. 1151 (1956) decided May 28, 1956. See also Moses Lake Homes v. Grant County, 365 U.S. 744, 81 S.Ct. 870, 6 L.Ed.2d 66 (1961), for further difficulties encountered by Wherry Act projects. By 1956, 272 projects, with insurance involving an aggregate of $690,945,270. had been processed under the Wherry Act.

Interestingly enough, and we suspect most accurately, Stickells suggests that in spite of the fact, for example, that in 1953 there was $12,000,000,000 of bonded public construction and that $37,500,-000,000 road construction had been but then (1956) recently authorized, the Miller Act "is an act not too commonly known or understood by the public".

committee", the report stated, "believes strongly in the principle that housing on or adjacent to military bases should be owned and operated by the military department concerned". In regard to the Wherry housing that had been built in obvious violation of that newly expressed principle, the report stated that "the bill would provide that as a matter of public policy Wherry housing shall be transferred from private hands to ownership by the military". We can not read the words "military department concerned" and "military" to mean anything other than "the United States of America".

The Housing Act of 1955 was a forecast of the change of Congressional policy away from private ownership of military housing that was made explicit and mandatory in 1956. Section 1594 of Title 42, U.S.Code, which made its original appearance in the 1955 legislation, authorized "[t]he Secretary of Defense * * * to enter into contracts * * to provide for the construction of urgently needed housing on lands owned or leased by the United States". And we think the shift from the private housing concept was significantly noted in the last sentence of Section 1594(a) which required that "Before the Secretary shall enter into any contract as authorized by this section for the construction of housing, he shall invite the submission of competitive bids after advertising in the manner prescribed in section 3 of the Armed Services Procurement Act of 1947" (which then appeared as 41 U.S.C.A. § 152. See 1955 U.S.Code Cong. and Adm. News, p. 739). Senate Report No. 571 regarding the Armed Services Procurement Act of 1947 (1948 U.S.Code Cong.Serv. p. 1048) stated that the purpose of that bill was to provide "for a return to normal purchasing procedures through the advertising-bid method on the part of the armed services".

Normal purchasing procedures for the United States, of course, contemplated that persons contracting with the United States, in connection with contracts exceeding $2,000 in amount, "for the construction, alteration, or repair of any public building or public work * * * shall furnish to the United States" the bonds required by the Miller Act under Section 270a of Title 40, U.S.Code.

If Judge Pickett was right in his factual evaluation of what a project built under the authorization of the Capehart Act is when stripped of its formalism— and we think that he was right in that regard [8]—then, to borrow his words, "[s]uch a project is not in reality one built by a private entity with private funds at private risk". But to say what a Capehart project was not, is not to say what it was—and for our present purpose in tracing its history—what it was before the 1956 Amendment. Only by knowing what Congress originally intended in 1955 can we glean what Congress intended in 1956. Our question is what must have been in the mind of Congress as expressed in its 1955 legislation to which it merely added the single sentence amendment in 1956 that authorized the Secretary of Defense to approve as "satisfactory" the surety or sureties on certain performance and payment bonds that "shall be deemed a sufficient compliance with the provisions of section 1 of the Act of August 24, 1935" [the Miller Act] and which also provided that "no additional bonds shall be required under such section", again referring to the Miller Act.

Our recognition of our national legislative history and experience requires, we believe, more than a myopic and isolated black letter view of the language of the particular statutes that we have thus far discussed. We believe we are under duty to inquire how the Congress, in 1947, for example, could describe any

---

8. And, at least by implication, we think that it must be said that Robertson Lumber also thought Judge Pickett was right on this score because its rationale in this regard is consistent with the theory upon which Judge Pickett based his dissent and is totally inconsistent with the theory upon which the majority in Harrison and Grimshaw relied.

governmental purchasing procedures as "normal" purchasing procedures. Such a description provided a ready and well understood communication to the Congress (if perhaps not to the federal judiciary) because it has been legislating in regard to government construction contracts for almost half our history as a Nation. And, as Austin T. Stickells points out in his excellent article "Bonds of Contractors on Federal Public Works —The Miller Act", 36 Boston Law Review 499 (1956), "the history of the Miller Act is a history of the previous acts and amendments".

That history commenced in 1894 with the Heard Act. It was designed primarily to protect only the United States from the type of government contractor activity so vividly described in a quasi-fictional way by our fellow Missourian, the great Mark Twain, in his "Gilded Age". Stickells points out (l. c. 501 and 502) that first the federal judiciary, and then the Congress, expanded the scope of the Heard Act to include not only protection of the United States but also protection for persons supplying labor and material who were not paid by the contractor engaged by the government.

By the 1905 amendment to the Heard Act (Act of Feb. 24, 1905, 58th Cong., 3d Sess. Ch. 778) the language of substance so familiar to persons studying the language inserted by the Secretary of Defense in the bonds involved in this case made its official appearance as a part of the law of the United States. That 1905 amendment provided specifically that "all persons supplying him [the contractor] with labor and materials in the prosecution of the work" would, along with the United States, be permitted to recover on the bond required by law.

The surety companies of that day, in sharp contrast with the position taken by the surety companies in this case, opposed any amendment to the then existing law because, according to Stickells, "they felt it was not desirable to change the existing law, which had a history of interpretation" (page 504 of 36 Boston Law Review).

The companies that wrote bonds in 1905 placed "primary emphasis * * upon the fact that since 1894, the date of the enactment of the original Act, and since the subsequent amendments to it, there had been many decisions in the United States Supreme Court and in the Federal Courts interpreting the language of the acts" (Stickells, at page 504). The argument against the amendment was that "to change the Act would cause or call for new interpretations of the phrases used in the Miller Act" and that "this would result in uncertainty insofar as underwriting was concerned" (Stickells, at page 504).

Congress, in evident recognition of the fact that the language was not radically different from that contained in then existing law, passed the 1905 amendment. And Congress, in 1935, when it passed the Miller Act, likewise used the familiar language of all the prior legislation, because it evidently recognized that such language had long acquired a gloss fully understood by the Congress and by everyone subject to the laws, including the bonding companies, contractors, sub-contractors, and the suppliers of labor and material on government projects.[9]

---

9. To establish beyond purview that "there is overall certainty [in regard to the meaning of the language in the Miller Act] with but few areas of conflict as yet open" and to support his conclusion that "the contract, the bond, and the statute [are] sufficiently definite and clear to enable the parties to properly evaluate their cases" with the result that "the parties and their attorneys [are] able to determine the merits of their cases without a trial", Stickells sets forth the figures from the Administrative Office of the United States Courts for the years 1952 through 1955 to point up the fact that "there are but a small number of cases filed throughout the country under the Miller Act" and that of those filed, only ten were decided by a jury in all four years (Stickells, at 545).

(Jury demands are presently outstanding in over twice that number in the Southern Division of this Court alone.)

The history of litigation under the Miller Act and its predecessor acts establishes that, perhaps uniquely, the language used in all of that legislation and its sometimes precise meaning became words of purchase and understood as a part of the working knowledge of the entire construction industry and of the bonding companies who served it. Stickells quite correctly points out that while in the very early days there were "many cases interpreting the Acts providing for bonds on Federal public works", most of which were decided even before the enactment of the Miller Act in 1935, nevertheless extensive litigation under the Miller Act was not necessary because the cases decided before its 1935 enactment were "relied upon as authority for interpretation of the Miller Act due to similarity of purpose and the use of similar language in the various acts" (Stickells, page 507).

The history of litigation, of course, is but one half the picture. Can it be said that when Congress passed the Capehart Act in 1955 it knew that the government and suppliers would be afforded Miller Act protection? If we assume, as we must, that Congress is presumed to know the state of existing law, then we believe it clear that the question must be answered in the affirmative.

Justice Holmes dealt with the question of what were "public works" within the meaning of the Heard Act. Echoing what is probably his most famous epigram from The Common Law, ("The Life of the law has not been logic; it has been experience".) he said in Title Guaranty Co. v. Crane Co., 219 U.S. 24, 33, 31 S.Ct. 140, 142, 55 L.Ed. 72 (1910), that "the association is only empirical, not one of logic".[10] And in United States for the Use of Noland v. Irvin, 316 U.S. 23, 62 S.Ct. 899, 902, 86 L.Ed. 1241 (1942), the Supreme Court determined that whether or not the United States even held actual title to a "public work" was not of controlling importance, pointing out that "[t]he respondents evidently had no difficulty interpreting the language of the Recovery Act or the Miller Act until they were called upon to meet the claims of petitioner".[11]

The question before us is not whether the Miller Act was applicable to actions on bonds for projects constructed under the 1955 Capehart Act before its 1956 Amendment. It is most relevant, however, to determine whether Congress thought the Miller Act was applicable to such actions independent of the 1956 Amendment. We think it highly significant that in the only mention made in the Congressional history of the 1956 Cape-

---

10. Judge Pickett's dissent in Harrison and Grimshaw is obviously in the tradition of that recommended rule of construction.

11. Noland also indicated that the matter of the cost of surety bonds was not unimportant. That case noted that the prime contractor "paid a premium of $8,172.25 for the bond, and the surety company accepted it without question". It is a well understood fact of economic life in the construction industry that there is no real difference between the amount of premium charged for a Miller Act bond and that charged for a bond designed by the Secretary of Defense for military housing construction under the authority of the Capehart Act. The premiums charged in each instance are determined by formulae generally established by the Surety Association of America, Inc. of New York City, and, more significantly, the premiums that are actually charged for either type bond, based on the contract price of a particular project, carry identical rates. Of course, the fact that the rates charged for both types of bonds may be the same does not definitely establish that the risks covered are identical. And although a surety might experience some slight embarrassment in attempting to explain to the premium payer why it charges the same premium for a bond that it legally contends is of more narrow coverage, nevertheless, the legal extent of coverage is determined by law and not by the rates of premium. And, in a more fundamental sense, all talk about premium rates is quite academic because, again as a practical fact of economic life, the premium cost on a government contract is either directly or indirectly added to the contract price so that the public eventually pays the cost of the bonds, regardless of what that cost might be. Cf. Stickells, page 499 of 36 Boston Law Review (1956).

hart Act relevant to our inquiry, the Congress was advised that the purpose of the specific single sentence amendment here involved was "to clarify" existing bonding requirements.

On May 24, 1956, Senator Sparkman, Chairman of the Subcommittee on Housing, in the course of his detailed explanation of the pending bill which ultimately became law, presented a Section by Section analysis of the bill. Section 108(f) of that analysis stated (102 Cong. Record 8874, 84th Cong., 2d Sess.) that the single sentence amendment:

"(f) Amends section 403(a) of the Housing Amendments of 1955 to clarify the bonding requirements imposed upon contractors who build under this act".

That amendment inserted the single sentence immediately before the last sentence of what is now Section 1594(a) of Title 42, U.S.Code, and provided that:

"Any such contract shall provide for the furnishing by the Contractor of a performance and a payment bond with a surety or sureties satisfactory to the Secretary of Defense, or his designee, and the furnishing of such bonds shall be deemed a sufficient compliance with the provisions of section 1 of the Act of August 24, 1935 (49 Stat. 793) [section 270a of Title 40, U.S.Code] and no additional bonds shall be required under such section".

The single sentence of the 1956 Amendment states four things of substance, not all of which are completely related. It is clear, however, that when the 1956 Amendment referred to "any such contract", it necessarily made reference to the sort of contract already authorized by the 1955 Act, and was referring specifically to contracts between the Secretary of Defense and existing contractors "to provide for the construction of urgently needed housing for military personnel of the armed services" of the United States. When the 1956 Amendment stated that "any such contract shall provide for the furnishing by

the contractor of a performance and a payment bond", it merely reiterated the duty already long imposed upon any government contractor by the Miller Act. When Congress said in the 1956 Amendment that the "surety or sureties" on the performance bond and payment bond must be "satisfactory to the Secretary of Defense, or his designee", it reiterated the existing requirements of the Miller Act that the "surety or sureties" in a government bond must be "satisfactory to the officer awarding such contract" (Section 270a (a) (1) and (2) of Title 40, U.S.Code) and merely identified "the Secretary of Defense, or his designee" as the only contracting officer authorized to award the military housing contract. While we find it most difficult to argue that the power vested in the Secretary of Defense by the 1956 Amendment is any greater than the same power long conferred on any contracting officer to determine whether or not the "surety or sureties" are or are not "satisfactory", we recognize that we are bound by what was inferentially said about that subject in Robertson Lumber. But that determination has but little effect on the ultimate determination involved because it is clear that Robertson Lumber also ruled that the form of the bond actually written by the Secretary of Defense was one substantially consistent with the legal requirements of the Miller Act. Regardless of how Robertson Lumber may have arrived at its conclusion, it expressly held that the bond actually used afforded "Capehart suppliers * * substantive bond protection essentially similar to that afforded Miller Act suppliers" (l. c. 799 of 305 F.2d).

 When the 1956 Amendment provided that "the furnishing of such bonds shall be deemed a sufficient compliance" with the provisions of the Miller Act, we can not believe that the Congress of the United States, by the use of that somewhat cryptic language intended to eliminate the existing legal necessity for the traditional construction bonds on government contracts authorized by the 1955 Capehart Act. The payment

and performance bonds referred to in the 1956 Amendment had long been required, in the language of the Miller Act, "for the protection of the United States" and for the protection of "[e]very person who has furnished labor or material in the prosecution of the work" provided in a government contract for "any public building or public work of the United States". We can not believe that the Congress, by a single clause in a single sentence, intended to change the well established law that the provisions of the Miller Act must be read into any and all payment and performance bonds required by that and other like legislation since 1894.

And, finally, we cannot conceive how it can be said that the portion of the 1956 Amendment that provided that "no additional bonds shall be required under such section" ("such section" being a direct reference to Section 1 of the Miller Act), evidences any Congressional intention other than a clear demonstration of its conviction that the Miller Act was applicable to all contracts that might be authorized under the then existing 1955 Capehart Act. The language of this last clause assumes on its face that the performance and payment bonds required by the Miller Act are legally required for government contracts entered into pursuant to the authority conferred by Congress in 1955. And that language of the 1956 Amendment is almost unintelligible unless read in context with Section 270a (c) of Title 40 which provides that:

"(c) Nothing in this section [Section 1 of the Miller Act] shall be construed to limit the authority of any contracting officer to require a performance bond or other security in addition to those, or in cases other than the cases specified in subsection (a) of this section".

We think that Congress must have intended by that last clause of the 1956 Amendment that if the Secretary of Defense determined that the surety or sureties on the payment and performance bonds were "satisfactory" to him, and if he determined that the bonds were in the minimum amounts required by the Miller Act, then, in those events, the Secretary of Defense could not exercise the power generally conferred on contracting officers assigned a particular government contract to require additional bonds or security as authorized by the Miller Act. Congress could have reasonably determined that the standard amounts required by law would be sufficient to protect all interests entitled to recover on the bonds.

In short, all that we can see that Congress intended by the last clause of the 1956 Capehart Act Amendment was to make sure that no additional bond or security above those required by Section 1(c) of the Miller Act was to be required on any military housing project authorized by the 1955 Capehart Act. Cf. Judge Grover's Analysis of subsection (c) of Section 1 of the Miller Act in Irwin v. United States, 1941, 74 App.D. C. 296, 122 F.2d 73.

It is our judgment that Congress indicated with apt choice of language, in the Section by Section analysis presented to the Senate, that the sole purpose of its single sentence 1956 Amendment to the Capehart Act was merely "to clarify the bonding requirements imposed upon contractors who build under this Act". We think it clear that, when viewed in both the long and short perspective of the history and experience of both the Miller Act and the 1955 Capehart Act that the action of Congress in connection with its 1956 Amendment was based upon a clear recognition that the Miller Act applied to military construction commenced under the 1955 Capehart Act. Congress recognized that the real effect of the 1956 Amendment was for the declared purpose of clarification only, and intended to spell out the fact that the contracting officer whose duty it was to determine whether a particular surety was or was not "satisfactory" within the meaning of the applicable Miller Act was the "Secretary of Defense, or his designee"; and that Congress wanted to make

clear that it would be content with the minimum amount of bond protection required by the Miller Act. If Congress had any larger purposes in mind, we find no evidence of any different intention in the Congressional history of the legislation.

■ We reach at long last the question of whether the liability of the bonding companies involved in these cases can be said to be fixed by "the terms of the bond as written" (p. 799 of 305 F.2d). That question was not reached in Robertson Lumber. And in considering that question we must never forget that the private parties concerned had nothing whatever to do with the actual terms of the bonds. The bonding companies agreed to be bound by the terms of a bond written by an officer of the United States presumably acting under the authority of the United States Congress. Do the bonds here involved provide for any different measure of liability than that Congress long understood to be established by the language of the Heard and Miller Acts? Is the answer to that question to be different merely because the language of the Miller Act was written into those bonds by the Secretary of Defense under a power he believed was conferred on him by Congress when it passed the Capehart Act? Assuming, as we must under Robertson Lumber, that the Secretary of Defense did have power to require "a bond satisfactory" to him, can we say that Congress (or even the Secretary of Defense) intended that any court should construe the same words differently merely because they appear in one instance in the Miller Act while in another the words were written into a bond by the Secretary of Defense? Did Congress intend that some court would give a different substantive meaning to those words in any action maintained by a person who had furnished labor or material in the prosecution of work furnished under a contract for a military housing project authorized by the Congress?

We would not follow either our controlling court (Robertson Lumber stated that "Congress intended that Capehart suppliers should have substantive bond protection essentially similar to that afforded Miller Act suppliers" [l. c. 799 at 305 F.2d]) or the expressed intention of the Congress if we should attempt to construe the words in the bonds involved in this case as providing for a different substantive bond liability than that established by the Miller Act merely because the words defining liability happen to appear in different places.

■ And perhaps of equal importance, we can not believe that Congress could have intended that there should be fifty different State law measures of liability on identical government bonds required by it for the construction of housing projects built for military personnel of the United States. Nor can we really convince ourselves that contractors, their suppliers, and their bonding companies really desire to be forced into such an underbrush of undeveloped State law in preference to a continuation of what has been described as "a constructive and successful approach to the solution of the normal risks involved in the construction business" (Stickells, supra, at page 550). Certainly such an abandonment and invitation to judicial chaos should not be judicially directed without a much more definitive expression on the part of the Congress that such is its intention.

For the reasons stated, the rules of decision that will be applied to the factual situations involved in the various cases will be the rules of decision developed under the Heard and Miller Act decisions. It follows, of course, that the principles of MacEvoy Co. v. United States, 322 U.S. 102, 64 S.Ct. 890, 88 L. Ed. 1163 (1944), will be followed rather than the State court cases cited by counsel in general and by plaintiffs' counsel in No. 1896 in particular. In determining the status of a particular plaintiff we shall accept the definitions announced in MacEvoy and attempt to apply them

realistically to facts of each pending case.[12]

Our ultimate decision on the question of whether attorney's fee and pre-judgment interest are recoverable under the language of the bond will be announced in a subsequent memorandum and order. We have those questions pending in litigation in several cases involving Kansas City counsel not involved in these consolidated cases. What we shall later say on these two subjects will be our rule for all cases.

## VI. STATUTE OF LIMITATIONS

Defendants' consolidated brief has a very short section calling attention to the possible effect that the 1959 amendment to the Miller Act might have on the claims asserted in Nos. 1807, 1814, 1889, 1897, and 1900. The question was not briefed by either side. We therefore do not now rule the question. Counsel are requested to advise the Court at the scheduled pre-trial conference whether the issue is still a live one in any pending case and to come prepared to state their respective general positions in regard to the question. With that information, we should be able to determine at pre-trial whether further briefs on this question should be filed.

## CONCLUSION

The views we have expressed in regard to the extent of bond coverage are sufficient to advise counsel that all of the particular cases that have been consolidated, like most cases, ultimately get down to the precise factual situation that may be involved in each. We therefore request that counsel give their best thought as to what procedural steps should next be taken in order to ascertain those facts. We would indeed be hopeful that counsel will be able to make concrete suggestions, preferably in writing, at the scheduled pre-trial conference. May we again express our appreciation for the excellent cooperation of counsel and for the excellent briefs submitted.

12. In this general connection, see United States v. Gunnar I. Johnson & Son, Inc., 8th Cir., 1962, 310 F.2d 899, 902, in which the court noted that the question of "furnishing" was a question of law, although, in that particular case, the legal question was not reached because the court accepted the stipulation of the parties.