The NATIONAL STATE BANK OF NEW-ARK, a National Banking Association, Plaintiff,

v.

TERMINAL CONSTRUCTION CORPO-RATION, a New Jersey corporation, and American Surety Company of New York, a New York corporation, Defendants.

Civ. No. 755–61.

United States District Court
D. New Jersey.

May 9, 1963.

Toner, Crowley, Woelper & Vanderbilt, John A. Ackerman, Newark, N. J., and Budd, Larner & Kent, Samuel A. Larner, Newark, N. J., for plaintiff.

Heller & Laiks, Aaron Heller, Passaic, N. J., for defendants.

LANE, District Judge.

This action is brought in two counts against a prime contractor and its surety to recover on payment bonds for work and labor performed on a Capehart housing project.

On the 5th day of October 1959, defendant Terminal Construction Corporation (hereinafter referred to as "Terminal"), contracted with the United States of America, acting through the Department of the Air Force, to construct certain Armed Services housing projects at McGuire Air Force Base, New Jersey. As required by the Capehart Act, 69 Stat. 651 (1955), as amended, 70 Stat. 1110 (1956), 42 U.S.C. § 1594(a) (1958), Terminal, as principal, and defendant American Surety Company of New York, as surety, executed a series of payment bonds [1] pursuant to the terms of which they agreed, jointly and severally, to make payments to all claimants as therein defined for labor and material furnished in the prosecution of the work.

Plaintiff, National State Bank of Newark, as assignee of claims of certain laborers on the project, seeks to recover from the prime contractor and surety, alleging that jurisdiction is based upon the Capehart Act and the Miller Act, 49 Stat. 793 (1935), as amended, 40 U.S.C. §§ 270a–270d, as amended, 40 U.S.C. §§ 270b–270c (Supp. III, 1962).

It appears that on September 14, 1959, Terminal, prime contractor, entered into two subcontracts with "O. A. Tatro and E. J. Morin, individually, T & M Plumbing Co., Inc., * * * in a Joint Venture with Kantor Brothers, Inc., * * *." One of said subcontracts (S–12) covered the items of work involving plumbing installations as set out in the prime contract and was in the sum of $1,288,500; the other (S–13) covered all items of water and heating system installations and was in the sum of $1,272,500. Each subcontract was signed by an officer of T & M Plumbing Co., Inc., and of Kantor Brothers, Inc., and by Oris A. Tatro, Ernest J. Morin and Irving Kantor, individually. In both instances Terminal waived the usual requirement that the subcontractor supply separate performance and payment bonds issued by a responsible surety acceptable to the contractor and approved by the contractor as to form and substance, accepting in lieu thereof the signature of all the parties to the contract and the guarantee of Irving Kantor.

On the 21st day of October 1959, T & M Plumbing Company, Inc., and Kantor Brothers, Inc., entered into an agreement providing for their participation in a joint venture as subcontractor to Terminal wherein they agreed upon a division of the responsibilities of performance of the subcontracts. This agreement was signed by Oris A. Tatro, as president of T & M Plumbing Company, and by Irving Kantor, as president of Kantor Brothers, Inc., and it contained the following provisions:

"A. The joint venture shall be called T & M-McGuire and is formed for the specific purpose of performing the contracts #S–12 and #S–13.

"B. This relationship will cease upon satisfactory completion of the contracts.

"C. T & M-McGuire is authorized to borrow from the National State Bank of Newark, N. J. to the extent necessary to complete the contracts.

"D. T & M-McGuire is authorized to assign the proceeds to the National State Bank of New-

---

1. The bonds bear the notation "FHA FORM NO. 2452 CP Revised May 1957." The defendants also executed performance bonds, "FHA FORM NO. 2452C Revised May 1957."

ark, N. J. as collateral for its borrowing, if the National State Bank so requests.

"E. T & M Plumbing Company, Inc. shall indemnify and hold Kantor Brothers, Inc. harmless from any claims, disputes, or law suits brought against T & M-McGuire for any reason whatsoever.

"F. Kantor Brothers, Inc. shall indemnify and hold T & M Plumbing Company, Inc. harmless from any claims, disputes, or law suits brought against T & M-McGuire for any reason whatsoever.

"G. T & M Plumbing Company, Inc. shall perform the work in the name of T & M-McGuire and shall conform to all the provisions of the contracts.

"H. Kantor Brothers, Inc. shall supply T & M-McGuire with all the materials necessary to perform the contracts other than that already supplied by subcontractors."

On October 30, 1959, Terminal, in a letter signed by its purchasing agent and written in reference to the Capehart housing project at McGuire Air Force Base (Contract #S–12 and Contract #S–13), informed T & M Plumbing Co., Inc. that the firm had been approved as a subcontractor for all items of work outlined in the referenced contracts, and directed T & M Plumbing Co., Inc. to proceed in accordance with the requirements of the project progress schedule.

Thereafter, T & M Plumbing Co., Inc., using personnel carried on its payroll, proceeded with construction at the work site, while Kantor Brothers, Inc. undertook to procure and supply the materials necessary for the performance of the subcontracts. Ernest J. Morin was included on the payroll as General Supervisor, and Edward Tatro, the son of Oris Tatro, president of T & M Plumbing Co., was employed for a time as a plumber's apprentice and later as an expeditor for the company. T & M Plumbing Co., throughout the period of performance, maintained its office in a trailer located at the McGuire Air Force Base a short distance from the situs of the offices Terminal maintained

On the 2d day of August 1960, an addendum to subcontracts #S–12 and #S–13 was agreed upon and signed by Oris A. Tatro, Ernest J. Morin, T & M Plumbing Co., Inc., by Oris A. Tatro, Kantor Brothers, Inc. by Irving Kantor, Irving Kantor, individually, and Terminal Construction Company by its president. The parties therein agreed, *inter alia,* that Oris Tatro would remove himself from the project for the duration thereof; that E. J. Morin would henceforth be in charge of the work to be performed by the subcontractor at the field level; that the subcontractor would unconditionally agree to exert every effort and energy for the maintenance of the contractor's progress schedule and in fulfillment thereof engage the services of such number of employees as may be necessary from time to time in the opinion of the contractor to maintain satisfactorily such schedule and supply the necessary equipment, supplies, and materials required; that the contractor was granted the right and privilege of engaging the services of such persons as it should like to serve as an expediter and coordinator; that such expediter or coordinator should be permitted to operate and function out of the subcontractor's field office and have access to all its books, records and documents pertaining to its performance; that the contractor should have the same right and privilege to engage the services of an expediter and coordinator for the flow of equipment, supplies, and materials to the job site, with such person being permitted to operate and function at the office of Kantor Brothers at Newark, with access to Kantor Brothers' books, records and documents; and that the execution of the addendum should in no way effect the unconditional guarantee that Kantor gave as to the full

and faithful performance of the subcontracts executed on September 14, 1959.

Late in 1959 plaintiff, the National State Bank of Newark, had commenced lending money to the joint venture known as T & M-McGuire; plaintiff advanced moneys on the basis of figures which the joint venture represented to involve the cost of materials, labor and general overhead expense for the work being done; as of September 1960 there was due to plaintiff bank from the joint venture as the result of these revolving loans approximately $334,000; early in September plaintiff bank became concerned with the extent of the loans and with the prospects of repayment, and on September 7th representatives of plaintiff bank met with representatives of the defendant Terminal in the latter's offices; the former were told by defendant Terminal's officers that they had no intention of meeting the joint venture's payroll due two days later on September 9th and it was incumbent upon plaintiff bank to find a way to meet this payroll or else defendant Terminal would default the contract and take over the performance of the work.

On September 9, 1960, after numerous conferences with attorneys, the officers of plaintiff bank addressed a letter to defendant Terminal, advising defendant that the "subcontractor" had assigned to plaintiff any and all sums of money which were to become payable by Terminal to "subcontractor" and that defendant was required to pay to plaintiff all such sums. Enclosed with this communication was a copy of the assignment to plaintiff bank dated 4th day of November 1959 and signed by Irving Kantor for T & M-McGuire Joint Venture, Oris A. Tatro for T & M Plumbing Co., Inc. and Irving Kantor for Kantor Brothers, Inc. In its reply, dated September 12, 1960, defendant Terminal stated that the provisions of the subcontracts prohibited any assignment thereof without written consent of the contractor and that defendant Terminal did not consent to the assignment nor did it recognize the same to any extent whatsoever.

On September 9, 1960, plaintiff bank entered into a new method of satisfying the payroll requirements at the site, whereby plaintiff, after receiving from the T & M Plumbing office a worksheet indicating how much was due each worker, prepared payroll envelopes which were taken from bank headquarters at Newark to the work site by one of its assistant vice presidents, accompanied by Mr. Kantor. Representatives of the bank, using the office of T & M Plumbing Co. at the site at McGuire, and assisted by the field office employees of T & M Plumbing Co., arranged to have each and every person on the payroll execute an assignment to the bank of the wages due him. The pay envelopes were released to the individuals as they deposited such executed assignments. In case a worker was not present on payday, it was arranged that he could go to plaintiff bank in Newark to execute the assignment and receive an envelope.

On September 9, 1960, and each week thereafter, plaintiff National State Bank received a certification to the effect that the payroll schedules presented represented bona fide debt of T & M-McGuire, a joint venture, for work performed by each person listed therein, and the letter of certification, signed by the presidents of Kantor Brothers, Inc. and T & M Plumbing Co., Inc. and Oris A. Tatro, Ernest J. Morin and Irving Kantor, individually, under the designation T & M-McGuire, a joint venture, contained a statement that the representations therein contained were made with the knowledge that the plaintiff bank would rely on the truthfulness of said statements and would, for valuable consideration to be paid to the listed employees, acquire an assignment of the claims of such employees.

Commencing with the payroll met on September 9, 1960, plaintiff bank, in return for the execution of assignments by the individual workers, handed over to each employee the sum of money that T & M Plumbing Co. represented he had

earned, and this system was followed for a period of 31 weeks. As of the payroll week ending November 22, 1960, plaintiff bank had paid over to the individual workers a total aggregate sum of $145,186.26. On November 29, 1960, the bank addressed a letter to defendant Terminal in which it advised that it was the holder and owner of individual assignments from each worker, and stated:

"Notice is hereby given pursuant to the provisions of Title 40 United States Code Annotated, Sections 270 (a) and 270(b) et seq., for and on behalf of each of the persons named in the attached weekly payroll records of the aforementioned Subcontractor, and for and on behalf of the National State Bank of Newark, assignee of said persons, of the unpaid claims of each of said persons for labor done and performed for said Subcontractor pursuant to direct contractual relationships with said Subcontractor. The claims of each of said persons are for labor furnished in the prosecution of the work provided for in the prime contract between Terminal Construction Corporation and the United States of America, and provided for in the aforementioned sub-contracts between Terminal Construction Corporation and the Subcontractor."

On December 2, 1960, Terminal replied to plaintiff's notice of November 29th, stating that before proceeding to evaluate the alleged claim, in fact or in law, that they would like to have furnished whatever additional proofs plaintiff might have, and that defendant would again communicate with plaintiff. Thereafter, plaintiff sent on photostats of three sample assignments taken at random from its files.

Again, on February 14, 1961, plaintiff addressed a letter to defendant Terminal, giving a notice in the same form as that given by letter dated November 29th, and made demand for the pay-

ment of individual assignments plaintiff had acquired during the payroll period commencing November 29, 1960, and ending January 24, 1961, in the total sum of $35,514.96. On February 15, 1961, defendant Terminal acknowledged receipt of this notice and stated:

"We are informed by general counsel that this claim is not entitled to preferential status under the applicable statutes as well as our contract documents. Under these circumstances we do not recognize the assignment and shall govern ourselves in accordance with the advices of our counsel."

Again, on April 19, 1961, plaintiff bank addressed Terminal, and also defendant American Surety Company of New York, giving a third notice and demanding the payment of $8,219.23, representing total amount of the value of assignments plaintiff had acquired during the period commencing with the payroll week January 31, 1961 and ending March 24, 1961, and referring to its previous notices and its total demand in the sum of $188,920.05.

Plaintiff herein seeks recovery in the sum of $188,920.05, together with interest and costs of suit, alleging that it gave due notice to the defendants of unpaid labor claims in compliance with all applicable statutes and the terms of the bonds filed in this matter, and by a second count seeks to recover the sum of $7,242.20, together with interest and costs of suit, alleging that it is owner of assignments in that aggregate sum made by the trustees of union pension and welfare funds in return for plaintiff's meeting Terminal's obligations arising from collective bargaining agreements.

Defendants deny liability and rely upon the following defenses:

I. This court has no jurisdiction because the suit was not brought in the name of the United States as required by § 2(b) of the Miller Act.[2] Also,

2. "Every suit instituted under this section shall be brought in the name of the

United States for the use of the person suing * * *." 49 Stat. 794 (1935),

throughout their briefs and arguments the parties have raised the issue of applicability of the Miller Act and the cases decided thereunder.

II. The assignors of the plaintiff are not proper claimants under the bond because they were employees of a sub-sub-contractor and thus not within the scope of those protected under the bond.

III. Claims under the bond are not assignable, and even if they were, subject assignments are not valid as the signators intended only to sign receipts for their wages.

IV. The required notice was not given to defendants.

V. The plaintiff is estopped from claiming for the wages as the defendants had received weekly certifications that the wages under dispute had been paid as due.

VI. Certain employees of T & M Plumbing Co., including one of the joint venturers and several office employees, do not come within the scope of those protected under the bonds.

VII. Assignees of the claims of trustees of union pension and welfare funds are not proper claimants under the bonds.

## I. JURISDICTION

Although subject bonds were not furnished in compliance with the terms of the Miller Act, United States to Use of Acme Furnace Fitting Co. v. Ft. George G. Meade Defense Housing Corp. No. 1, 186 F.Supp. 639 (D.Md.1960), several courts have held that a suit on a Capehart bond must be brought under the Miller Act, and that the latter Act grants the court jurisdiction to hear the case. Lasley v. United States for Use of Westerman, 285 F.2d 98 (5th Cir., 1960) (alternate holding); United States to Use of Acme Furnace Fitting Co. v. Ft. George G. Meade Defense Housing Corp. No. 1, supra; (alternate holding); Autrey v. Williams & Dunlap, 185 F. Supp. 802 (W.D.La.1960); Gypsum Contractors, Inc. v. American Surety Co., 37 N.J. 315, 181 A.2d 174 (1962) (holding that state courts have no jurisdiction over Capehart Act bonds); [3] see Autrey v. Williams & Dunlap, 210 F.Supp. 491 (W.D.La.1962) (alternate holding). The rationale of these cases is that the Capehart Act [4] incorporates the Miller Act by reference.

as amended, 40 U.S.C. § 270b(b) (Supp. III, 1962). At the trial, this court granted the plaintiff's motion to amend their complaint, if such were necessary, so as to designate the plaintiff as United States of America for the use of The National State Bank of Newark, a National Banking Association.

3. The Supreme Court of New Jersey rejected the contention that it had jurisdiction despite a specific bond provision allowing suit to be brought in the state courts. Its holding was based upon the inconsistency between the bond provision and § 2(b) of the Miller Act.

The subsequent opinions in Continental Casualty Co. v. United States for Use and Benefit of Robertson Lumber Co., 305 F.2d 794 (8th Cir.), cert. denied, 371 U.S 922, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962), and United States for Use and Benefit of Miles Lumber Co. v. Harrison & Grimshaw Construction Co., 305 F.2d 363 (10th Cir.), cert. denied, 371 U.S. 920, 83 S.Ct. 287, 9 L.Ed.2d 229 (1962), cast doubt upon the *ratio decidendi* of the New Jersey opinion and would seem to suggest there is jurisdiction in the state courts. See 28 U.S.C. § 1352 (1958) which grants concurrent jurisdiction in the state courts.

4. "The Secretary of Defense or his designee is authorized to enter into contracts * * * to provide for the construction of urgently needed housing * * *. Any such contract shall contain such terms and conditions as the Secretary may determine to be necessary to protect the interests of the United States. Any such contract shall provide for the furnishing by the contractor of a performance bond and a payment bond with a surety or sureties satisfactory to the Secretary of Defense, or his designee, and the furnishing of such bonds shall be deemed a sufficient compliance with the provisions of section 1 of the Act of August 24, 1935 (49 Stat. 793) [40 U.S.C. § 270a (1958)], and no additional bonds shall be required under such section. * * *" 69 Stat. 651 (1955), as amended, 70 Stat. 1110 (1956), 42 U.S.C. § 1594 (a) (1958).

However, the latest decisions in this area hold that such is not the case. In Continental Casualty Co. v. United States for Use and Benefit of Robertson Lumber Co., 305 F.2d 794 (8th Cir.) cert. denied 371 U.S. 922, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962), the court goes into the mechanics of a Capehart project with great detail and concludes:

"While we think that Congress intended that Capehart suppliers should have substantive bond protection essentially similar to that afforded Miller Act suppliers, we think also that Congress intended that the procedural provisions of Capehart bonds should be worked out and prescribed by the two agencies involved in the light of the unique nature of Capehart construction and of the peculiar problems which might be encountered in connection with such construction. In our estimation had Congress intended for the procedural provisions of the Miller Act to apply to Capehart contractors and their sureties it simply would have said so." 305 F.2d at 799.

In Northwest Lumber Sales, Inc. v. S. S. Silberblatt, Inc., 211 F.Supp. 749 (E.D.Mo.1962), the court followed Continental Casualty and held that the venue provisions of the Miller Act do not apply to a suit on a Capehart bond. See also United States for Use and Benefit of Fine v. Travelers Indemnity Co., 215 F.Supp. 455 (W.D.Mo.1963).

Another court, the Tenth Circuit, has analyzed the language of the Capehart and Miller Acts and also concluded that a bond given under the Capehart Act does not fall within the scope of the Miller Act. United States for Use and Benefit of Miles Lumber Co. v. Harrison & Grimshaw Construction Co., 305 F.2d 363 (10th Cir.) cert. denied, 371 U.S. 920, 83 S.Ct. 287, 9 L.Ed.2d 229 (1962).

We consider this the better construction of the statute, and accordingly rule that the procedural provisions of the Miller Act do not apply to the bonds in suit.

It does not follow, however, that this court is without jurisdiction in the matter. 28 U.S.C. § 1352 (1958) provides: "The district courts shall have original jurisdiction, concurrent with State courts, of any action on a bond executed under any law of the United States." A Capehart bond is issued under a law of the United States and this court has jurisdiction thereon. United States for Use and Benefit of Miles Lumber Co. v. Harrison & Grimshaw Construction Co., supra; Lasley v. United States for Use of Westerman, supra (alternate holding); Continental Casualty Co. v. United States for Use and Benefit of Robertson Lumber Co., supra, 305 F.2d at 798, n. 4; United States for Use and Benefit of Fine v. Travelers Indemnity Co., supra; Autrey v. Williams & Dunlap, 210 F.Supp. 491 (W.D.La.1962) (alternate holding); see 1 Moore, Federal Practice ¶0.60 [8.–3] (2d ed. 1961); cf. United States for Use and Benefit of Bryant Electric Co. v. Aetna Casualty & Surety Co., 297 F.2d 665 (2d Cir.1962), 76 Harv.L.Rev. 635 (1963). Contra, United States for Use of General Accident Fire & Life Assurance Corp. v. Maguire Homes, Inc., 186 F.Supp. 659 (D.Mass.1959) (semble).

Finally, defendants contend that the suit must be dismissed for failure to bring it in the name of the United States, as required by the Miller Act.[5] But, as we have noted above, this action is not governed by the procedural provisions of the Miller Act. The Real Party in Interest Rule, Fed.R.Civ.P. 17(a), reads:

"Every action shall be prosecuted in the name of the real party in interest; but * * * a party with whom or in whose name a contract

---

5. See note 2, supra. However, the bonds provide that the claimant "may sue on this bond for the use of such claimant in the name of either of the Obligees or their assignee hereunder, or in the name of the claimant * * *."

has been made for the benefit of another, or a party authorized by statute may sue in his own name without joining with him the party for whose benefit the action is brought; and when a statute of the United States so provides, an action for the use or benefit of another shall be brought in the name of the United States."

Here, the plaintiff is the real party in interest, and under the rule, can bring suit in its own name.[6] See 3 Moore, Federal Practice, ¶17.07 (2d ed. 1948). It is only in the cases where the United States is obligee that the suit

must be brought in the name of the United States.[7] Nor is any problem presented by the fact that the plaintiff is the assignee of the beneficiaries of the bond. United States for Use and Benefit of Wolther v. New Hampshire Fire Ins. Co., 173 F.Supp. 529, 535 (E.D. N.Y.1959); see United States for Use and Benefit of Gefen v. Conn. 19 F.R.D. 274 (E.D.S.C.1956); United States to Use of Shade Shop, Inc. v. R. B. McDanel Co., 16 F.Supp. 905 (E.D.Va. 1936); 1 Moore, Federal Practice, ¶17.-09 (2d ed. 1948).

■ The next question is how controlling as to substantive law are cases

6. As far as this court can ascertain, this is the first Capehart Act case in which this issue has been raised. This court has found ten reported cases involving Capehart bonds. Continental Casualty Co. v. United States for Use and Benefit of Robertson Lumber Co., 305 F.2d 794 (8th Cir.) cert. denied 371 U.S. 922, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962); United States for Use and Benefit of Miles Lumber Co. v. Harrison & Grimshaw Construction Co., 305 F.2d 363 (10th Cir.) cert. denied 371 U.S. 920, 83 S.Ct. 287, 9 L.Ed.2d 229 (1962); Lasley v. United States for Use of Westerman, 285 F.2d 98 (5th Cir., 1960); American Surety Co., of New York v. United States for Use of Frigidaire Sales Corp., 282 F.2d 427 (1st Cir., 1960); United States for Use and Benefit of Fine v. Travelers Indemnity Co., 215 F.Supp. 455 (W.D.Mo.1963); Northwest Lumber Sales, Inc. v. S. S. Silberblatt, Inc., 211 F.Supp. 749 (E.D.Mo. 1962); Autrey v. Williams & Dunlap, 210 F.Supp. 491, 185 F.Supp. 802 (W.D. La.1962, 1960); United States for Use of General Accident Fire & Life Assurance Corp. v. Maguire Homes, 186 F. Supp. 659 (D.Mass.1959); United States, to Use of Acme Furnace Fitting Co. v. Ft. George G. Meade Defense Housing Corp. No. 1, 186 F.Supp. 639 (D.Md. 1960); Gypsum Contractors, Inc. v. American Surety Co., 37 N.J. 315, 181 A.2d 174 (1962).

Maguire and Gypsum were the only cases dismissed for lack of jurisdiction. As to Gypsum, see note 3, supra. Maguire is the only reported federal case in which the court did not find jurisdiction based upon § 1352, diversity, or the Miller Act. The court held that there was no jurisdiction under § 1352 or the

Miller Act because the United States was not a named party to the Capehart bond. As the standard form of the bond does not name the United States as a party, this view of necessity would be rejected by the cases that base jurisdiction upon § 1352 or the Miller Act, which includes all of the above cited federal cases, except those arising in the First Circuit.

Compare Gypsum with the cases arising in the First Circuit. The former holds that state courts have no jurisdiction while the latter say the federal courts will take jurisdiction only on diversity. If both are correct, there will be no forum where there is no diversity between the parties.

The Ft. George G. Meade case cites four unreported decisions from the District of Rhode Island in which the court refused to base jurisdiction upon the Miller Act. 186 F.Supp. at 647, n. 3.

Maguire is of no help in the issue of whether the suit must be brought in the name of the United States, as that case, as far as the opinion discloses, involves both Miller and Capehart bonds.

It is interesting to note that in Autrey, the court held that jurisdiction was based upon the Miller Act, yet of the seven cases listed in the heading, four were brought in the name of the United States and three were not.

In Frigidaire, the only case arising in the First Circuit in which the court retained jurisdiction over a Capehart bond, jurisdiction is evidently based upon diversity. See the opinion of the lower court, 186 F.Supp. 767 (D.Mass.1959).

7. In the instant bond, the obligees are the McGuire AFB Housing No. Fourteen, Inc. (the "Mortgagor-Builder") and the Kings County Trust Company (the "Lender").

decided under the Miller Act. In many Capehart bond cases they have been cited and followed without any discussion of the point. See, e. g., United States to Use of Acme Furnace Fitting Co. v. Ft. George G. Meade Defense Housing Corp. No. 1, supra. However, the Eighth Circuit has said:

> "[W]e are of the opinion that when Congress amended the Capehart Act in 1956 it recognized that Capehart housing is not conventional Government construction, that the private construction and financing of Capehart housing and the joint administration of the Capehart program by the Department of Defense and the Federal Housing Administration presented problems not encountered in ordinary Government construction, and that it intended, as far as bond protection for laborers and materialmen is concerned, to treat Capehart housing *sui generis.*" Continental Casualty Company v. United States for Use and Benefit of Robertson Lumber Company, supra, 305 F.2d at 799.

We find the protection accorded by the Miller and Capehart Acts is in many instances identical. Both are an attempt to protect the laborers and material men on a government project, where they may have no rights under the state lien laws.[8] To this extent the two acts should be interpreted together, and this court will do so except in those cases where the Miller Act, or the cases decided under it, are contradicted by the Capehart Act, the cases decided under it, or the terms of the bond.[9]

## II. JOINT VENTURE

Defendants contend that plaintiff's assignors, employees of T & M Plumbing Co., Inc., had no direct contractual relationship with defendant's subcontractor as required by the bonds, and therefore cannot recover; and that its subcontractor was a joint venture made up of two companies and two individuals and the workmen assignors were not employed by such joint venture but were rather employed by T & M Plumbing Co., Inc., a sub-subcontractor.

Indeed, recovery must be denied to employees of a sub-subcontractor. See Clifford F. MacEvoy Co. v. United States for Use and Benefit of Calvin Tomkins Co., 322 U.S. 102, 64 S.Ct. 890, 88 L.Ed. 1163 (1944). However, plaintiff asserts that the work at the site was performed by the joint venture and that the workingmen assignors were employees of the subcontracting joint venture.

> "Precise definition of a joint venture is difficult. The cases are of little help since they are generally restricted to their own peculiar facts. 'Each case in which a coadventure is claimed * * * [sic] depends of course for its results on its own facts, and owing to the multifariousness of facts, no case of coadventure rises higher than a persuasive precedent for another.'" United States v. Standard Oil Co. of California, 155 F.Supp. 121, 148 (S.D.N.Y.1957), aff'd 270 F.2d 50 (2d Cir., 1959).

The New Jersey courts have laid down certain tests to be used in determining

---

8. But see United States for Use and Benefit of Miles Lumber Co. v. Harrison & Grimshaw Construction Co., 305 F.2d 363, 367, n. 11 and accompanying text (10th Cir.), cert. denied 371 U.S. 920, 83 S.Ct. 287, 9 L.Ed.2d 229 (1962); United States to Use of Acme Furnace Fitting Co. v. Ft. George G. Meade Defense Housing Corp. No. 1, 186 F. Supp. 639, 645 (D.Md.1960) (suggests that the laborers did have rights under the Maryland lien law).

In the present case, there is no evidence as to who owns the land upon which the project is located and we make no finding as to the applicability of the New Jersey lien law.

9. For an extensive analysis of the history of and policy behind the Miller and Capehart Acts arriving at a similar result, see United States for Use and Benefit of Fine v. Travelers Indemnity Co., 215 F. Supp. 455 (W.D.Mo.1963).

352

whether a joint venture does in fact exist:

"The *sine quo non* of joint venture is a contract purposefully entered into by the parties. The joint venture is not a status created or imposed by law but is a relationship voluntarily assumed and arising wholly *ex contractu*, express or implied. * * *

* * * * * *

"In this State a joint venture has been defined as 'A special combination of two or more persons where in some specific venture a profit is jointly sought without any actual partnership or corporate designation,' and 'a joint adventure is an undertaking usually in a single instance to engage in a transaction of profit where the parties agree to share profits and losses.' * * * Between the parties to a joint venture, a common element is a fiduciary relationship. * * *

* * * * * *

" * * * A joint adventurer may entrust actual control of the operation to his coadventurer and it still remains a joint venture." Wittner v. Metzger, 72 N.J.Super. 438, 443–446, 178 A.2d 671, 674–676 (App. Div.), cert. denied 37 N.J. 228, 181 A.2d 12 (1962).

In Wittner, the court also quoted with approval from 2 Williston, Contracts, § 318A (3d ed. 1959):

"Although its existence depends on the facts and circumstances of each particular case, and while no definite rules have been promulgated which will apply generally to all situations, the decisions are in substantial agreement that the following factors must be present:

"(a) A contribution by the parties of money, property, effort, knowledge, skill or other asset to a common undertaking;

"(b) A joint property interest in the subject matter of the venture;

"(c) A right of mutual control or management of the enterprise [*but see Wittner*, supra];

"(d) Expectation of profit, or the presence of 'adventure,' as it is sometimes called;

"(e) A right to participate in the profits;

"(f) Most usually, limitation of the objective to a single undertaking or ad hoc enterprise." (Footnotes omitted.)

It seems clear that on the 14th day of September 1959, when defendant Terminal contracted with "O. A. Tatro and E. J. Morin, individually, T & M Plumbing Company, Inc., * * * in a joint venture with Kantor Brothers, Inc., * * * " no method of procedure had been set out for the conduct of the joint venture, and it is equally clear that at no time thereafter did the defendant suggest to the members of the joint venture any particular mode of procedure. As we have noted, on October 30, 1959, Terminal's representative addressed a letter to T & M Plumbing Co., Inc., one of the joint venturers, informing the company that *it* had been approved as a subcontractor for all items of work outlined, and directing *it* to proceed in accordance with requirements of the project progress schedule. Moreover, T & M Plumbing Co., Inc. set up its office on the work site within close proximity to the office of defendant Terminal, and from January 1, 1960, to March 8, 1961, defendant received each and every week from T & M Plumbing Co.'s site office a payroll certification signed by "J. W. Stiles, Office Manager," setting out the amounts paid to the persons employed by "T & M Plumbing Company, Inc., contractor or subcontractor." The proofs further establish that defendant Terminal had assigned its employees to check constantly the T & M Plumbing Co. work force throughout the course of the job and that defendant Terminal's official representative at the project site gave instructions to T & M Plumbing Co.'s office employees. Finally, it is significant that the parties to subject

subcontracts executed an "Addendum" thereto on August 2, 1960, after several months of work site performance, wherein the parties recognize that Oris Tatro (president of T & M Plumbing Co., Inc., and a joint venturer) had been principally in charge of the work to be performed by the subcontractor at the field level and agreed he was to be replaced by E. J. Morin (a joint venturer who had received weekly wages from T & M Plumbing Co., Inc.). The subcontractor further agreed thereafter to engage the services of such number of employees as in the opinion of Terminal might be necessary from time to time to maintain the progress schedule satisfactorily. Also, Terminal was under the terms of the "Addendum" granted the right and privilege of engaging the services of an expediter or coordinator who should be permitted to operate and function out of the subcontractor's field office and to have access to all its books, and to have the same privilege of engaging an expediter for the flow of equipment, supplies and material to the job site with the right of that person to operate and function at the office of Kantor Brothers, at Newark, New Jersey, with access to the books.

Defendant Terminal, having accepted throughout the course of performance the fact that the joint venturers had entrusted the accomplishment of the work at the site to coadventurer T & M Plumbing Co., Inc., cannot be heard to complain after complete acceptance of this method of operation and its work product.

The defendants further argue that a search of the proper records of the State of New Jersey fails to reveal any organization with the name T & M-McGuire. N.J.Rev.Stat. 56:1–2, as amended L.1951, c. 225, N.J.S.A. 56:1–2 provides:

"No person shall conduct or transact business under any assumed name, or under any designation, name or style, corporate or otherwise, other than the real name or names of the individual or individuals conducting or transacting such business, unless such person shall file a certificate in the office of the clerk of the county * * *."

T & M-McGuire did not comply with this statutory provision. Such statutory violation is not, however, a bar to the offending party's recovery on an executed contract. Rutkowsky v. Bozza, 77 N.J.L. 724, 73 A. 502 (E. & A.1909). The purpose of the statute is to enable a person to know to whom he is giving credit. In the present case there is no such problem for defendants knew who the principals behind T & M-McGuire were and, indeed, dealt with them from day to day.

### III. ASSIGNMENTS

Ordinarily, claims under a payment bond are assignable. Title Guaranty & Trust Company v. Crane Co., 219 U.S. 24, 31 S.Ct. 140, 55 L.Ed. 72 (1910); Third National Bank of Miami v. Detroit Fidelity & Surety Co., 65 F.2d 548 (5th Cir.) cert. denied 290 U.S. 667, 54 S.Ct. 88, 78 L.Ed. 577 (1933); United States to Use of Fidelity Nat'l Bank of Spokane, Wash. v. Rundle, 100 F. 400 (9th Cir., 1900); Maryland Casualty Co. v. Philbrick & Nicholson, Inc., 147 Wash. 277, 266 P. 142 (1928); cf. Southern Surety Co. v. People's State Bank, 47 F.2d 93 (4th Cir., 1931). But defendants argue that the provisions of paragraph 13 [10] of the subcontracts render such assignments void because defendant

10. "13. NON-ASSIGNABLE: This Agreement, or any part thereof, shall not be assigned, transferred, or sublet by the Subcontractor, nor shall the Contractor be liable to any assignee, transferee, or sub-lessee, without the written consent of the Contractor, and no such written consent shall release the Subcontractor from any obligation hereunder. The Sub-

contractor shall submit for the approval of the Contractor the name or names of all persons, companies, or corporations to whom it intends to sublet or subcontract any of its work, as well as copies of proposed contracts between the said Subcontractor and such persons, companies and corporations, and the Contractor reserves the right to disapprove of any

had not given prior approval thereto. For authority, they cite DeVita v. Loprete, 77 N.J.Eq. 533, 77 A. 536 (E. & A. 1910). Aside from the question of the applicability of New Jersey cases in Capehart bond matters, we think that the DeVita case is not in point. There, the contract with the city prohibited assignment of the contract, yet the parties contracted to divide the profits. Their agreement constituted a detriment to the city in that it served to discourage freedom in bidding.

■ The assignments here involved are not of the contract, nor of any rights under the contract, but of rights under the bond, which are not governed by the contract. The Supreme Court has pointed out that "a denial of an assignee's right to sue on the bond might deprive those for whom the security was intended of a fair chance to realize upon their claims by assignment." United States for Benefit and on behalf of Sherman v. Carter, 353 U.S. 210, 219, 77 S.Ct. 793, 798, 1 L.Ed.2d 776 (1957) (footnote omitted).

■ Defendants argue that the paper writings signed at the work site by each employee prior to receiving a pay envelope from plaintiff bank's representatives should not be accorded legal status as assignments for the reason that the signators did not realize they were executing wage assignments. Not so, for it is settled law in New Jersey that "affixing a signature to a contract creates a conclusive presumption, except as against fraud, that the signer read, understood, and assented to its terms." Fivey v. Pennsylvania R. R., 67 N.J.L. 627, 632, 52 A. 472, 473 (E. & A. 1902). See Pergot v. Steiker, 18 N.J.Super. 134,

138–139, 86 A.2d 788, 790–791 (App. Div.), cert. denied 9 N.J. 403, 88 A.2d 537 (1952), and cases therein cited.

We, therefore, hold that the assignments executed in favor of plaintiff bank during the 31 weeks it handed pay envelopes to the workers employed at the McGuire Base are valid and binding insofar as the proofs establish the signators are accorded protection under the bonds.

## IV. NOTICE

It is conceded that defendant Terminal received by registered mail the letter notices dated (1) November 29, 1960, (2) February 14, 1961, and (3) April 19, 1961, and that defendant American Surety Company received by registered mail the notices dated (2) February 14 and (3) April 19, 1961. Defendants deny that defendant American Surety Company received the notice (1) dated November 29, 1960, and they deny any responsibility for the $145,186.26 therein claimed, arguing that proper notice was not given.

The notice provisions of the bonds require that a claimant give notice to any two of "the Principal, any one of the Obligees, or the Surety." This notice must be given within 90 days "after the date on which the last of such claimant's work or labor was done or performed or materials were furnished." Additionally, the bonds require that "such notice shall be served by registered mail, postage prepaid."

There are two distinctions between the notice provisions of the instant bonds and those of the Miller Act. Under § 2(a) of Miller,[11] notice must be given only if the claimant has no direct con-

such person, company, or corporation for whatever reason it determines sufficient * * *."

11. "Every person who has furnished labor or material in the prosecution of the work provided for in such contract, in respect of which a payment bond is furnished under this Act and who has not been paid in full therefor before the expiration of a period of ninety days after the day on

which the last of the labor was done * * *, shall have the right to sue on such payment bond * * *: *Provided, however,* That any person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the

tractual relationship with the contractor, whereas in the instant bond it must be given in all cases. As the assignors of plaintiff bank had no direct contractual relationship with defendant Terminal, they are not affected by this distinction; they or their assignees would have an obligation to give written notice under either. Also, under Miller, notice need only be given to one of the parties, whereas under the provisions of subject bonds, notice to two of the parties is required.

■ Although there is some dispute in the cases, as has been discussed under Part I, supra, we hold that the notice provisions of the bond are here applicable, not those of the Miller Act. See Continental Casualty Co. v. United States ex rel. Robertson Lumber Co., 305 F.2d 794 (8th Cir.), cert. denied 371 U.S. 922, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962); United States for Use and Benefit of Miles Lumber Co. v. Harrison & Grimshaw Construction Co., 305 F.2d 363 (10th Cir.), cert. denied 371 U.S. 920, 83 S.Ct. 287, 9 L.Ed.2d 229 (1962); United States for Use and Benefit of Fine v. Travelers Indemnity Co., 215 F.Supp. 455 (1963)

■ In general, the notice provisions must be strictly construed, as they are conditions precedent to the right to sue. Fleisher Engineering & Construction Co. v. United States for Use and Benefit of Hallenbeck, 311 U.S. 15, 61 S.Ct. 81, 85 L.Ed. 12 (1940). As has been stated by this court:

"Written notice must be given by the supplier [or laborer] to the contractor in such a manner that it is obvious that the supplier [or laborer] is looking to the contractor for payment. There are innumerable cases involving a wide variety of fact situations in which decisions have been made on this point to the effect that notice must come from

date on which such person did or performed the last of the labor * * *. Such notice shall be served by mailing the same by registered mail, postage pre-

the supplier himself and that notification, of whatever nature, from the subcontractor to the contractor is not sufficient." United States for Use of Flow Engineering, Inc. v. Continental Casualty Co., 195 F. Supp. 177, 179 (D.N.J.1961).

We find that, except for the registry requirement of the notice of November 29, 1960, to the surety company, the notices met all of the formal requirements.

■ Although the bonds require that the notice be sent by registered mail, this is not necessary if the claimant can show that the notice was actually received. Fleisher Engineering & Construction Co. v. United States for Use and Benefit of Hallenbeck, supra; United States for Use and Benefit of Fine v. Travelers Indemnity Co., supra.

■ Plaintiff contends that the mailing of the notice raises a presumption that it was received. In general, this is correct, Hetman v. Fruit Growers Express Co., 200 F.Supp. 234 (D.N.J.1961) (Wortendyke, J.), especially where the presumption is corroborated by other evidence. Borden Co. v. United States, 134 F.Supp. 387 (D.N.J.1955) (Forman, C.J.), This rule has been stated by the courts of New Jersey:

"By force of statute or by agreement, a required notice may be effectively given if properly mailed, regardless of its receipt. Absent such a legislative enactment or contract provision respecting the method of giving notice, the general rule is that there is a presumption that mail matter correctly addressed, stamped and mailed was received by the party to whom it was addressed, which presumption is rebuttable and may be overcome by evidence that the notice was never in fact received." Szczesny v. Vas-

paid, in an envelop addressed to the contractor * * *." 49 Stat. 794 (1935), 40 U.S.C. § 270b(a) (1958).

quez, 71 N.J.Super. 347, 354, 177 A.2d 47, 50 (App.Div.1961).

Since, however, the parties to the subject bonds provided for notice by registered mail, evidence of mailing by ordinary mail cannot be here held to give rise to a presumption of receipt but is only to be regarded as another piece of evidence for the trier of the facts to consider in reaching his conclusion as to whether or not the notice (1) of November 29, 1960, was in fact received.

Robert R. Ferguson, a vice president of plaintiff bank, arranged for the registering of the three notices mailed to defendant Terminal and for the registering of the second and third notices mailed to defendant American Surety Company. On November 29, 1960, the date of the first notice, Ferguson addressed a letter to Robert Lowery, a lawyer employed in the offices of American Surety:

"November 29
"19 60
"Mr. Richard Lowery
"Legal Department
"American Surety Company of New York
"100 Broadway
"New York 4, New York
"Dear Mr. Lowery:
"As you asked this morning, I am enclosing herewith a copy of a letter which we have today sent registered mail to Terminal Construction Corporation, regarding demand for payment of $145,186.26 to the National State Bank of Newark as assignee, of claims for labor done and performed for the Subcontractor referred to in the letter.
"We are also attaching a set of the photostats referred to for your records.
 "Very truly yours,
 "Robert R. Ferguson, Jr.
 "Vice President
"RRF/rmb
"Encs."

Ferguson testified that he enclosed with the letter addressed to Lowery a copy of the first notice dated November 29th, as well as copies of the payroll sheets. (Indeed, both enclosures are referred to in the letter.) He instructed those in his office to mail the letter addressed to Lowery and he does not recall whether or not he instructed that it be registered. Ferguson states he later spoke to Lowery at American Surety, who acknowledged receipt of the letter. Additionally, we have the rebuttal testimony of John A. Ackerman, Esquire, who acted as counsel for the National State Bank during the period in question and who assisted in the trial of this matter, to the effect that sometime in mid-February, 1961, shortly after the second notice was sent out by plaintiff bank, he called at the offices of defendant, American Surety Company of New York, to determine just what the terms of subject bonds were and whether they were bonds under the Miller or the Capehart Act; that on this occasion he found Robert Lowery was not present and was referred to and talked with a Mr. Beckworth; and that in the course of his meeting with Beckworth he saw among the papers contained in the file of defendant surety company a copy of the letter of November 29th Ferguson addressed to Lowery, together with the photostats of payroll records.

Defendants called Richard W. Lowery, who had no recollection of ever having received the notice dated November 29, 1960, and who testified that he had received calls from Mr. Ferguson, the first, in his best judgment, occurring shortly after February 14th, the date of the second notice sent by the bank; and that in his search of the company files in New York the day preceding his appearance in court he was unable to locate a copy of the notice dated November 29, 1960, or the original of the letter Ferguson testified he addressed to Lowery on that date. He further states that as to plaintiff bank's claim in this case, he had felt that all matters should be referred to defendant Terminal, whom he had consid-

ered good for payment, and that he had had no worry about loss to his company. Lowery had made a longhand memorandum concerning his first conversation with Ferguson, and it was shown to contain a reference to a $140,000 claim. It further appears that when he did receive plaintiff's claim he wrote a letter to defendant Terminal but he could not locate a copy of such letter in defendant surety's file. The claim abstract Lowery states he made up shortly after his first conversation with Ferguson contained under the item "Description or Cause of Loss" a reference to a claim by Minneapolis-Honeywell Regulator Co. and no reference to plaintiff bank.

Frank N. Beckworth, an employee of defendant surety company during the period in question, testified that he had no recollection of seeing and talking with John Ackerman in February of 1961 or at any other time; that he had nothing to do with bonds written for Terminal but rather Lowery handled those matters; that if he received a letter pertaining to a claim on the bonds in question, he would have referred it to Lowery; that he had no recollection of having discussed the McGuire Air Force job of Terminal's with Lowery or anyone else; and that he and Lowery were the two surety attorneys with defendant at that time who had familiarity with problems on Capehart bonds.

This court finds from a consideration of all the testimony and the exhibits offered on the issue that the notice dated November 29, 1960, was in fact received by defendant surety company and that, therefore, both defendants are bound by all three notices insofar as the claims presented therein are found to be valid.

The three notices sent out by plaintiff bank in each instance cover work performed within 90 days of the notice date. We need not therefore consider the doctrine of Noland Co. v. Allied Contractors, Inc., 273 F.2d 917 (4th Cir., 1959) to the effect that if the notice is within 90 days of *any* work performed by an individual laborer, it will cover *all* the work of that laborer.

## V. ESTOPPEL

 Contracts S-12 and S-13, executed on September 14, 1959, by defendant Terminal and the joint venturers each provide [12] for Terminal to make monthly partial payments of approximate estimates of the amount of work completed and materials, equipment, and services furnished each month on or about the 25th day of the ensuing month, provided that all labor and material delivered to the job and all taxes have been paid by the subcontractor and that the contractor has on each such date been paid by the owner. There are in each contract provisions for percentage withholdings until final acceptance of the work. And each contract states all checks to the subcontractor shall be made payable jointly to T & M Plumbing Co., Inc. and Kantor Brothers, Inc., and when so done, such checks should constitute payment in accordance with the terms of the subcontract.

It appears from the proofs submitted that on November 24, 1959, defendant Terminal made the first direct payment ($16,235.81) to T & M Plumbing Co., Inc. and Kantor Brothers, Inc., under the provisions of Contract S-12, and as of August 3, 1960, when the sum of $51,155.70 was paid, such direct pay-

---

12. Paragraph 23 of the contracts reads: "RETAINAGE AND PAYMENTS: In consideration of the faithful performance by the Subcontractor, of the covenants and conditions in this Agreement, the Contractor agrees to make monthly partial payments of approximate estimates of the amount of work completed and materials, equipment and services furnished each month, on or about the 25th day of the ensuing month, provided, however, that all labor and material delivered to the job, and all taxes have been paid by the Subcontractor, and provided that the Contractor has on each such date been paid by the Owner * * *. As a condition precedent to any payment due the Subcontractor, it shall deliver to the Contractor a release from all of its Subcontractors and Materialmen, in form satisfactory to the Contractor, as well as an affidavit as to all unpaid materialmen, labor, etc., incurred or to be incurred by the Subcontractor * * *."

ments aggregated the sum of $651,370.-17. After August 3, 1960, Terminal made no other direct payments to T & M Plumbing and Kantor Brothers in connection with Contract S-12, except for a single isolated payment in the sum of $2,600.00, made on September 21, 1960, the purpose of which is not disclosed by the proofs. As to Contract S-13, Terminal made a single direct payment to T & M Plumbing Co., Inc. and Kantor Brothers, Inc., on January 22, 1960, when a check in the sum of $29,629.60 was drawn. During the period January 22 to August 8, 1960, fourteen checks were drawn in connection with payments to be made under Contract S-13 to T & M Plumbing, Kantor Brothers, and J. H. Mailander Co., Inc., and these fourteen payments were in the aggregate sum of $634,596.46.

No payments were made on Contract S-12 during the period from August 3d to August 17th, and no payments made on Contract S-13 from August 8th to August 17th, 1960. Commencing August 17, 1960, defendant Terminal instituted a practice as to both contracts of drawing checks jointly to T & M Plumbing Co., Inc., Kantor Brothers, Inc., and to various suppliers, to cover the cost of materials supplied to the job. It would appear that commencing with August 17, 1960, defendant Terminal made no payment whatsoever to the subcontracting joint venturers which could be applied to labor costs.

Thus, we find that for one month prior to the payroll of September 9th, Terminal gave to the joint venture checks that covered supplies furnished to the job which the joint venturers were required to endorse and forward to the suppliers. During this month the joint venturers received no moneys that could be applied to payroll.

As of September 6th, 1960, a few days before plaintiff bank first gave the site workers the equivalent of their weekly wage claims in exchange for wage assignments, plaintiff bank had loaned the joint venture for cost of materials, labor, and general overhead expense, the sum of $334,000. And at meetings held on September 6th and 7th, officers of defendant Terminal informed representatives of the bank and of the subcontractor that Terminal would not make any loans and, if the payroll were not met, it would take over the job. At that point, plaintiff bank decided it was incumbent upon it to keep the job running in the name of the joint venture and decided upon the taking of wage assignments.

The notice of November 29, 1960, covered wage assignments in the aggregate sum of $145,186.26, signed by the workers during the period September 9th to November 22d, 1960. During that same period defendant Terminal had paid out by checks drawn jointly to T & M Plumbing, Kantor Brothers, and various suppliers an aggregate sum of $500,000.00 to cover the costs of materials delivered to the job site. During this 90-day period the joint venturers received no moneys that could be applied to payroll.

After the receipt of the notice of November 29, 1960, Terminal did not dictate cessation of performance but rather allowed the joint venture to continue its work until performance was completed several months later. After November 29th, Terminal continued to meet the bills for supplies purchased by the joint venture in the same manner as before. On December 6th and 9th, 1960, Terminal drew a total of 16 checks in the joint names of T & M Plumbing, Kantor Brothers, and various suppliers. These 16 checks aggregated approximately $20,000 and apparently covered the cost of the last of the materials needed to complete Contracts S-12 and S-13.

Thus, we see that from August 17, 1960, to the completion of work several months later, defendant Terminal advanced to the joint venture only such sums as were needed to cover the cost of materials delivered to the work site. During that period of several months it made no funds available to the joint venture that could be used to meet any part of the weekly wages due the men on the job whose work was closely checked each day by representatives of Terminal.

This is so, despite the fact the work was progressing and Terminal continued to receive payments from the owner in accordance with the terms of the prime contract. The record contains no agreement as to, or explanation for, the abandonment of the terms of the subcontract pertaining to payments

Defendants argue plaintiff bank is estopped from asserting the wage claims covered by assignments for the reasons (1) plaintiff represented it would continue to loan money to subcontractor for payroll payments on and after September 9, 1960; (2) subcontractor, with plaintiff's knowledge, continued the practice of furnishing defendants certifications of weekly payroll payments; and (3) defendant Terminal, having been led to believe the subcontractor had itself met the payrolls, allowed the joint venture to continue with its performance and paid out large sums of money in relation thereto that Terminal would not otherwise have paid.

The proofs do not establish that plaintiff represented to defendants it would continue to make loans to subcontractor for the September 9, 1960, and subsequent payrolls; nor was plaintiff bank duty bound to continue to loan money to the joint venture throughout September and subsequent months. The evidence does not establish that plaintiff bank had knowledge that subcontractor continued its practice of furnishing defendant Terminal certifications of weekly payroll payments.[13] As to the latter, the office manager of T & M Plumbing Company's field office has testified that he, throughout the months, followed the instructions of Terminal's office manager in signing an affidavit each week to the effect "all persons employed on the project have been paid in full the weekly wage" and that so far as he was concerned, this affidavit was as valid subsequent to September 9, 1960, as it had been prior thereto.

Estoppel is defined:

"To create an equitable estoppel, a false representation or concealment of material facts must be made, by a person with knowledge, actual or constructive, of the real facts, to a person without such knowledge, with the intention that it shall be acted on by the latter person, and he must so rely and act thereon that he will suffer injury or prejudice by the repudiation or contradiction thereof or the assertion of a claim inconsistent therewith." 31 C.J.S. Estoppel § 67, p. 254 (1942).

The general principles of estoppel apply to suits upon a Miller bond. Moyer v. United States for Use of Trane Co., 206 F.2d 57, 39 A.L.R.2d 1098 (4th Cir., 1953); United States, to Use of Noland Co. v. Maryland Casualty Co., 38 F.Supp. 479 (D.Md.1941). However, the plaintiff in any event would be estopped only to the extent that the defendant relied and only as to the amount of damages actually sustained through the reliance. See United States, to Use of Noland Co. v. Maryland Casualty Co., supra.

We conclude defendant Terminal's argument that plaintiff bank made false representations or concealed material facts with the intention Terminal should act thereon is not supported by

---

13. Even had the bank had knowledge that the payrolls were being certified, there is a question whether it would be estopped. Generally, the misrepresentation must come from the person sought to be estopped, e. g. 31 C.J.S. Estoppel, §§ 71, 78 (1942), and there is no evidence that Stiles, the employee who executed the certifications, was acting as an agent of plaintiff bank. However, an exception to the general rule exists where there is acquiescence to the misrepresentations of a third party. See Augustus v. New Amsterdam Casualty Co., 100 F.2d 581 (7th Cir., 1938), cert. denied, 307 U.S. 631, 59 S.Ct. 834, 83 L.Ed. 1514 (1939). But there can be no acquiescence where there is no knowledge. Therefore, plaintiff bank cannot be bound by the certifications made by the subcontractor.

Nor can it be argued that the bank, as assignee, is bound by the acts of its assignors. The laborers, not the subcontractor, are the assignors, and there is no way in which the certifications can be attributed to the laborers.

the evidence. Nor do we find that defendant Terminal has suffered injury or prejudice by the fact of plaintiff's purchase of wage claims.[14] Indeed, defendant Terminal during the several months following August 17, 1960, received the benefit of the labor furnished by the joint venture in carrying on the work to completion. Terminal, both as general contractor and as obligor on the performance bond, was duty bound to see that the necessary material was furnished and labor performed. It recognized its contingent obligation under the bond to pay for materials furnished; it cannot now refuse to recognize an obligation for labor on the basis that had it known of the assignments it would have cancelled the subcontract. Had cancellation been effected, Terminal would then have had to furnish the labor which was in fact furnished by plaintiff's assignors.

## VI. PERSONS PROTECTED UNDER THE BONDS

Section 1 of the bond provides:

"A claimant is defined as one having a direct contract with the Principal or with a subcontractor of the Principal who has furnished labor, material, or both, in the prosecution of the work provided for in the Contract and who has not been paid in full therefor. Labor and material are construed to include, but are not limited to, that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment directly applicable to the contract."

As a general rule, the courts tend to give a very broad construction to the class of people entitled to protection under these bonds. See Standard Accident Insurance Co. v. United States for Use and Benefit of Powell, 302 U.S. 442, 58 S.Ct. 314, 82 L. Ed. 350 (1938); Brogan v. National Surety Bank, 246 U.S. 257, 38 S.Ct. 250, 62 L.Ed. 703 (1918); American Surety Co. of N. Y. v. United States ex rel. Barrow Agee Laboratories, Inc., 76 F.2d 67 (5th Cir., 1935); United States for Use and Benefit of Farwell, Ozum, Kirk & Co. v. Shea-Adamson Co., 21 F.Supp. 831 (D.Minn.1937) (all decided under the Heard Act.)[15]

In the Shea-Adamson case the scope of the bond included work done by a superintendent or foreman.

"It may be true that the term 'labor' in this statute, as generally in statutes relating to mechanics' liens, refers to physical labor rather than technical and professional skill and judgment, but an architect or other skilled man who actually superintends the work as it is done is by the weight of authority furnishing labor. * * * [Citation omitted.] It was so held under the federal statute where the superintendent did some manual labor * * *. [Citations omitted.]" American Surety Co. v. United States ex rel. Barrow Agee Laboratories Inc., supra, 76 F.2d at 68.

The liberal construction given to the Heard Act is also to be given in cases arising under the Miller Act. See Mac-

14. The general rule is that, where there is an assignment, the debtor or obligor cannot be prejudiced by any acts he does before he receives notice of the assignment. See 3 Williston, Contracts § 433 (3d ed. 1960); Restatement, Contracts § 167 (1932). Cf. Knickerbocker Trust Co. v. Coyle, 139 F. 792 (D.N.J.1905); Reinfeld v. Fidelity Union Trust Co., 123 N.J.Eq. 428, 198 A. 220 (Ch.1938), affirmed per curiam, 125 N.J.Eq. 347, 5 A. 2d 699 (E. & A.1939). Defendants argue that had they known of the assignments,

they would have terminated the subcontracts and, therefore, they are prejudiced because they continued operating under the contracts. We find no merit in this as there was no termination when defendants did have notice of the assignments. Also, they have failed to demonstrate that they were damaged by keeping T & M on as subcontractor.

15. Act of August 13, 1894, ch. 280, 28 Stat. 278, as amended, 33 Stat. 811 (1905), 36 Stat. 1167 (1911). This act is the predecessor of the Miller Act.

Evoy v. United States for Use and Benefit of Calvin Tomkins Co., 322 U.S. 102, 107, 64 S.Ct. 890, 88 L.Ed. 1163 (1944) (dictum). "The courts have refrained from attempting an all-inclusive definition of [labor and] material furnished in the prosecution of the work." United States for Use and Benefit of J. P. Byrne & Co., v. Fire Association of Philadelphia, 260 F.2d 541, 543–544 (2d Cir., 1958). The test developed by the courts is that the labor and materials must be furnished in the prosecution of the work. The Miller Act "does not require that the labor or material furnished be actually used or incorporated into the contract work." Fourt v. United States for Use and Benefit of Westinghouse Electric Supply Co., 235 F.2d 433, 435 (10th Cir., 1956).

But however broad the rule is, the coverage of the bond will not be extended to one who is one of the partners or joint venturers constituting the subcontractor. This was the rule under the Heard Act, Theobald-Jansen Electric Co. v. P. H. Meyer Co., 77 F.2d 27 (10th Cir., 1935); United States for Use and Benefit of Walker v. United States Fidelity & Guaranty Co., 4 F.Supp. 854 (D.Wyo. 1933), and the rule has been followed under the Miller Act. St. Paul-Mercury Indemnity Co. v. United States for Use of Jones, 238 F.2d 917 (10th Cir., 1956).

Nor can the correctness of the rule be questioned. The purpose of the bond is to protect the laborers in the event the subcontractor should fail or otherwise become unable to pay the wages. To extend the protection of the bond to the subcontractor or one of its principals would mean that the surety would, in effect, be a guarantor of the profits or success of the subcontractor.

It necessarily follows that E. J. Morin, one of the joint venturers, is not entitled to protection and that the wage assignments executed by him in the aggregate sum of $8,441.96 do not constitute valid bases for recovery against the defendants Terminal and American Surety Company.

This court reaches a like conclusion in respect to the wage assignments ($1,739.76) executed by John Rothenberg, a certified public accountant, hired on a two-day a week basis, for internal auditing, accounting, and preparing payroll tax returns. The services he performed cannot be held to constitute labor furnished in the prosecution of the work. However, site office manager Stiles and the few employees who worked under him in daily active support of all phases of performance including the satisfying of daily complaints and demands of defendant Terminal, would seem to fall within the class of persons covered, and we deem their assigned claims valid bases for recovery here.

Therefore, on the first count of the complaint, plaintiff will be awarded the amount demanded, less the amounts constituting the assignments of E. J. Morin and John Rothenberg, or the principal sum of $178,738.33.

## VII. TRUST FUNDS

 Trustees of welfare and pension funds may be claimants under the bonds. See United States for Benefit and on Behalf of Sherman v. Carter, 353 U.S. 210, 77 S.Ct. 793, 1 L.Ed.2d 776 (1957). However, defendants contend the welfare fund claims presented here do not come within the scope of the notices received.

Not so. The proofs disclose that the defendants received a letter dated December 29, 1960, signed by a trustee of each of the two welfare funds involved, notifying defendants of an aggregate claim of $20,242.20. The proofs also disclose that the trustees received a check drawn by defendant Terminal dated January 9, 1961, in the amount of $13,000.00, leaving an unpaid claim of $7,242.20, which is the amount demanded by plaintiff in its second count.

Plaintiff has introduced assignments executed by the trustees of the funds, dated December 15, 1960, covering the amount in question, and we conclude plaintiff is entitled to recover the $7,242.20 demanded.

We find that plaintiff bank is entitled to judgment in the principal amount of $185,980.53. Interest and other items to be settled by motion on notice.

Submit an order.